2024 IL App (1st) 220494
No. 1-22-0494
Opinion filed November 22, 2024

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 08698 |
| | ) | |
| ANTRELL JOHNSON, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Oden Johnson concurred in the judgment and opinion.
Justice Oden Johnson also specially concurred, with opinion.
Presiding Justice Tailor dissented, with opinion.

**OPINION**

¶ 1    The quest for justice faces formidable challenges, especially when the decisive evidence is eyewitness testimony. Antrell Johnson appeals his first degree murder conviction, which was based solely on testimony from four eyewitnesses. He argues that the State failed to prove his guilt beyond a reasonable doubt, as there was no physical evidence or a motive and, most consequentially, a high likelihood of eyewitness misidentification.

¶ 2     The State insists the eyewitnesses' inconsistencies with one another, and with their own prior statements, "as a whole," do not undermine its case, though a jury split its verdict in finding Johnson not guilty of attempt first degree murder of one victim and inexplicably, guilty of first degree murder of another.

¶ 3     Eyewitness identification seems intuitive, but, as we will discuss, it involves complex audio and visual processes that impact perception. After closely examining the record and drawing reasonable inferences in the State's favor, as we must, we conclude that no rational trier of fact could have convicted Johnson under the test set out in the United States Supreme Court's opinion in *Neil v. Biggers*, 409 U.S. 188 (1972). That test directs the courts to weigh the " 'totality of the circumstances' " in "evaluating the likelihood of misidentification." *Id.* at 199-200.

¶ 4     The majority and the dissent interpret the same record differently. Each of the four eyewitness accounts, as we will explain, is fraught with inconsistencies, contradictions, and the risk of errors under the *Biggers* factors. The dissent, however, does not acknowledge any of this, referring to "the strength of the eyewitness testimony." *Infra* ¶ 152. The majority's approach reflects an objective analysis of the evidence rooted in both reason and reality, not speculation or assumption. We reverse.

¶ 5                                    BACKGROUND

¶ 6     A jury delivered a split verdict, finding Antrell Johnson guilty of first degree murder of Taurean (Torey) Tyler while acquitting him of attempted first degree murder of shooting Deangelo Mixon, though both were shot by the same assailant at the same time. At trial, the State had no physical evidence tying Johnson to the shooting and relied on the testimony of four eyewitnesses. We summarize the evidence.

- 2 -

¶ 7    The security camera from a nearby muffler shop captured grainy video footage showing a dark car turn 90 degrees, let out someone wearing dark clothes, and retreat in the direction it came. A person in a black top and white pants runs across the screen for less than a second.

¶ 8    At about 7:30 p.m., Robert Laster and his wife, Janeese Washington, sat in the rear seats of a Nissan Altima parked in a church lot, waiting for choir practice to begin. Laster was on the driver's side, and Washington was next to him. From about 30 feet away, Laster, facing south, saw the back of a person in a black bomber jacket, white pants, and a black hat. Suddenly, the person fired several shots at two young men from behind them and, an instant later, ran past the car.

¶ 9    At the scene, police interviewed Laster and Washington, combining their description without attributing either. The resulting composite reflected a "male black, medium brown complected between the age of 16 and 25, about [five-six], [five-nine], between [125], 150 pounds with black hair in a faded type of haircut."

¶ 10    Laster testified he "knew" the shooter was a man but did not look at his face or discern his skin color. He recalled: "[J]ust trying my best to keep everyone in the car calm so, you know, we weren't any other casualties. *** I was yelling, everybody kind of crouched down, just keep quiet."

¶ 11    Nine days later, Laster reviewed a photo array that included Johnson's photo. He selected no one. Nine days after that, he participated in an in-person lineup that included Johnson, identifying someone other than Johnson as the shooter.

¶ 12    Washington testified that she saw the shooting through the driver's side windshield and door window. Both the shooter and the victims had their backs to Washington. The shooter, wearing white jeans and a baseball cap, ran up and shot the two young men. Washington "kind of scooted" down when she heard the shots, trying to stay out of sight and avoid becoming a target.

She said the baseball cap obscured part of the shooter's face. She could not recall what else the shooter wore or which hand held the gun.

¶ 13    Washington participated in a photo array and selected Johnson. After choosing him, she cited his "kind of caramel skin" and that "his nose was big and his lips were big." Police did not have Washington participate in a lineup.

¶ 14    Tristan Thomas was on his porch, an unspecified distance away. Thomas struggles to see distances and needs but does not use prescription eyeglasses. Thomas could not testify to any details about the shooter except that the person was a light-skinned African American, wearing a black jacket and a "hoody pulled tight." He did not know the shooter's gender.

¶ 15    The morning after the shooting, police officers interviewed Thomas. At trial, the State confronted Thomas with his response, "Yes," when asked if he had a "clear, unobstructed view of this person [the shooter]." He also told the police that he could "practically" see the shooter's face, clarifying that he could see "most of his face," "just his head, and a little bit of his mouth covered." Shown a photo array, he identified Johnson.

¶ 16    Before the jury, Thomas denied he had a clear, unobstructed view. He recounted seeing someone run up behind his friends, Tyler and Mixon, and shoot from seven to eight feet away. After the shooter fled, Thomas rushed to them, and Mixon said, "It was Antrell." Thomas testified that the shooter wore a mask "just a little bit," and insisted he identified Johnson because of what Mixon told him. The State introduced part of the transcript from Thomas's photo identification of Johnson:

> "OFFICER: [H]ow do you recognize this person?
>
> THOMAS: [T]hat's him?
>
> OFFICER: [Y]ou seen him, where I mean?

THOMAS: [S]hooting yesterday.

OFFICER: [S]hooting yesterday where.

THOMAS: 69th and Honore.

OFFICER: [S]o this is the person who was shooting on 69th and Honore.

THOMAS: [Y]esterday.

OFFICER: [D]id you see anyone get shot there where they were shooting.

THOMAS: [Y]eah.

OFFICER: [A]nything.

THOMAS: [Y]es, my friend got killed and the other one got shot[.]"

¶ 17    When confronted with this statement, Thomas acknowledged that he recalled giving those answers but clarified, "that was after the fact, after I told y'all that I practically seen somebody and I said that was the shooter because that's what my friend said." Asked by the State whether the person he circled was the shooter, Thomas said: "I told y'all that's what [Mixon] told me who did the shooting." Thomas testified that he recognized the person he circled in the photo because "I been knew him," and maintained that the shooter was not Johnson. "I didn't technically see him do anything, I seen somebody with a mask shooting my friend." He repeatedly said he based his identification on what Mixon told him, adding that the shooter had "[l]ight skin." To a question whether the same person he saw "out on the street shoot Torey and Delo" was in court, Thomas said, "Yes."

¶ 18    Mixon testified that he had known Johnson for "a few years," they were friends, his family knew Johnson's family, and he had visited Johnson's house. At the time of the trial, Mixon's sister was dating Johnson's brother and had a child together.

¶ 19    Around the shooting, Mixon had been getting into trouble, smoking marijuana "a lot" and drinking "a lot." Mixon admitted to having been drinking on the day he got shot, though he didn't specify how much, and he admitted to having just bought a cigar for the purpose of "roll[ing] a blunt" and smoking with Thomas. It was daylight as he and Tyler neared Thomas's house. Mixon noticed a black car but paid no attention to it. Thomas appeared on his porch and all at once looked "like he was shocked." Startled, Mixon spun around to find a gun about a foot from Tyler's back.

¶ 20    Mixon did not see the shooter. He was scared, traumatized, and preoccupied with the gun. He repeatedly testified that he "don't know who it was holding the gun." When he turned, "all I seen was the gun, shots went off[,] and I blinked out." Mixon heard seven shots, fell to the ground face-first, and saw the shooter run toward the black car, which drove off. Mixon could not recall what he had told Thomas when he came to help. Mixon remained "scared and traumatized," continuing to fear for his safety. He felt pain in his "left buttocks." Asked if he knew who shot him, Mixon said, "I really don't." Asked if he felt bad for identifying someone who didn't shoot him, he said, "That's what I've been telling the State."

¶ 21    Mixon's trial testimony diverged from his statements to investigators on the night of the shooting. The trial record does not reveal how intoxicated or medicated Mixon was in the aftermath of the shooting. (An assistant state's attorney testified that he confirmed with Mixon's nurse how Mixon had received medication as recent as 4:30 a.m. before the videotaped interview from his hospital bed.) Sometime after the shooting, Mixon spoke with detectives and named Johnson as the shooter. At 4:00 a.m., two other detectives administered a photo array. Mixon circled Johnson's photo and wrote "Wolcott Antrell."

¶ 22    About six hours later, an Assistant State's Attorney (ASA) spoke with Mixon from his hospital bed and made a one-minute-and-fifty-nine-second video, which was introduced into

evidence. Mixon said he turned around when shots were fired and saw Johnson about two to three feet away. He told Thomas, "Trell shot me." At trial, Mixon denied that Johnson shot him and that his family ties to Johnson had nothing to do with his recantation.

¶ 23    Dr. Ponni Arunkumar, the Chief Medical Examiner of the Cook County Medical Examiner's Office, testified she conducted the autopsy on Tyler. She said it showed five gunshot wounds, none fired at close range.

¶ 24    In his defense, Johnson called his mother Dorothea Morris and Kennedi Myles, an ex-girlfriend, both of whom saw him on the day of the shooting. Johnson visited a grandmother's house, where his mother was with his daughter. His mother saw him pick up his daughter but could not recall what time that occurred. She did not mention seeing Myles. Myles recalled meeting Johnson at a grandmother's house but did not mention seeing his grandmother. Johnson's cousin, Vernon Johnson, who was on house arrest, was there as was Vernon's girlfriend. At one point, Johnson and Vernon Johnson were on the porch. Shortly after arriving, Myles heard gunshots, and Johnson quickly came inside.

¶ 25    Myles said they left Johnson's grandmother's house when the sun was about to set but did not know the time. The State reminded Myles that she had told an investigator she arrived home between 6:00 p.m. and 7:00 p.m. Myles reported this timeline in a written statement, saying she got home around 7:00 p.m. or 7:30 p.m. Based on these statements, she said that the gunshots she heard would have been around 3:30 p.m. She said that Johnson left her house later that night, around 8:00 p.m. or 9:00 p.m., but she could not remember where she and Johnson were around 7:30 p.m.

¶ 26    While deliberating, the jury asked for transcripts of testimony from Washington and Laster as well as transcripts of testimony from Morris and Myles. The jury also asked about the definitions

of "intent" and "great bodily harm." The jury returned a split verdict, finding Johnson guilty of the first degree murder of Tyler and not guilty of the attempted first degree murder of shooting Mixon.

¶ 27 In a post-trial hearing, Johnson argued that the evidence was insufficient to convict, owing to the lack of physical evidence and the contradictory trial testimony. Johnson also argued that the trial counsel provided ineffective assistance by failing to call Vernon Johnson. The trial court denied Johnson's motions and sentenced him to 55 years in prison.

¶ 28                                    ANALYSIS

¶ 29 Johnson argues that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. To decide whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, we review the sufficiency of the evidence in the light most favorable to the prosecution. *People v. Lloyd*, 2013 IL 113510, ¶ 42. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or witness credibility. It will reverse only where the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt regarding the defendant's guilt remains. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 30 No physical evidence linked Johnson to the crime. He did not confess. The State presented no evidence of motive. The case hinges entirely on the testimony of the four eyewitnesses. In *Biggers*, 409 U.S. 188, the Supreme Court set out factors to protect defendants from convictions based on "the likelihood of misidentification," including (i) the opportunity to view the perpetrator during the crime, (ii) the degree of attention, (iii) the accuracy in reporting prior descriptions of the perpetrator, (iv) the level of certainty at the time of identification, and (iv) the length of time between the crime and the identification. *Id.* at 199-200. We evaluate each factor for the likelihood of misidentification.

¶ 32	The first *Biggers* factor—the witness's ability to view the offender at the time of the offense—is the most critical, although no individual factor dictates the outcome. See *In re O.F.*, 2020 IL App (1st) 190662, ¶ 32. The distance, lighting conditions, attentiveness, quality, length of time of the view, and presence of distractions—among other variables—can directly affect the reliability of what the witnesses claim to have seen. See *People v. Lerma*, 2016 IL 118496 ¶ 26 (noting "the stress of the event itself" and "use and presence of a weapon" can impact the witness's opportunity to view and study offender). In addition, without circumstantial evidence, the brevity of the encounter has a heightened impact on the risk of misidentification. See *People v. Herrett*, 137 Ill. 2d 195, 204-06 (1990) (circumstantial evidence, including proceeds of robbery, confirmed identity where witness had "several seconds" to observe attacker from "only two feet").

¶ 33	Here, each eyewitness caught a fleeting glimpse of the shooter, mainly from behind, amid an extremely stressful situation. Over 40 years of extensive research on eyewitness identification shows that the presence of a weapon commands an eyewitness's attention and diminishes the ability of the eyewitness to describe or recognize the offender, a phenomenon known as the weapon-focus effect. See Jonathan M. Fawcett, Kristine A. Peace & Andrea Greve, *Looking Down the Barrel of a Gun: What Do We Know About the Weapon Focus Effect?*, 5 J. of Applied Res. in Memory and Cognition, 257, 261 (2016) ("[E]ach witness account must be scrutinized to determine whether weapon focus is relevant ***."); *State v. Henderson*, 27 A.3d 872, 921-22 (N.J. 2011) (noting stress, weapon focus, and duration as factors that interfere with eyewitness's ability to view and study offender).

¶ 34	Thomas told police he had a clear and unobstructed view but later admitted that his poor eyesight made it difficult for him to see the shooter's features. At trial, he could not even say if the

shooter was a man or a woman. Likewise, Mixon described Thomas as appearing so "shocked" he could not speak. Contrary to the dissent's implication (*infra* ¶¶ 121, 123), Thomas consistently maintained he "practically" saw the shooter, noticing just two details—race (a light-skinned African American) and clothing (black jacket and a tight hoodie); see also *infra* ¶¶ 64, 87 (majority analysis regarding Thomas).

¶ 35 Robert Laster had the next-best view of the shooter, but due to the stress of the moment and the 30-foot distance between them, he could discern little more than the shooter's skin color and clothing. Laster, concerned about his safety, crouched down and testified he did not look at the shooter's face. Laster's wife, Washington, seated to her husband's right, also crouched down. She could not see what the shooter wore and said that his baseball cap partially blocked her view of his face. Neither knew Johnson.

¶ 36 Mixon was closest but provided the most conflicting accounts. Initially, in the hospital, he said he turned on hearing shots and saw Johnson. His account, however, lacked specifics, including duration. At trial, he described how he turned to see the gun on Tyler's back just before shots went off, was scared and traumatized, and "blinked out." We do not know what medications he had been administered for his injury before he spoke with investigators. But we know that Mixon said he was drinking that day and highlighted how, at that time, he generally drank and smoked marijuana "a lot." See *Henderson*, 27 A.3d at 921 (noting influence of alcohol or drugs as relevant to ability to observe). Contrary to the dissent's contention otherwise (*infra* ¶ 129), the record establishes Mixon's impairment at the scene and does not clear that cloud by the time of the hospital interview. Only by disposing of these facts out of hand does the dissent restore Mixon's account. Compare *infra* ¶ 114 (arguing majority dismisses critical facts), with *infra* ¶ 129 (asserting "I reviewed" record and "saw no visible signs of impairment").

¶ 37    This factor benefits the defense. The shocking suddenness of the shooting—together with the weapon focus effect, distance, obscured views (shooter behind the victims and the victims between the shooter and the other three witnesses), stress level, and shooter's rapid movement—adversely impacted each eyewitness's ability to view and perceive the shooter.

¶ 38                                    *Degree of Attention*

¶ 39    Again, the weapon focus effect and the trauma of the shooting compromised Laster's, Washington's, and Mixon's attention.

¶ 40    Mixon's trial testimony indicates that he was under inordinate duress, fixated on the gun, and felt frightened and traumatized. He admitted to drinking earlier and "blink[ing] out" on seeing the gun. He insisted that he never had a chance to look beyond the gun before being shot. Mindful of these facts, Mixon's account conveys a justifiable risk of misidentification.

¶ 41    Even disregarding his trial testimony, Mixon's statements to the ASA while hospitalized lacked specifics on attentiveness. He recounted that he "looked back. Shots were fired," suggesting his glance toward the shooter coincided with his being shot. Yet, he stated, "Trell shot me," with no elaboration whatsoever.

¶ 42    Tellingly, the testimony of the Cook County Medical Examiner contradicts Mixon. In his statement to the ASA, Mixon described the shooter as about two to three feet away. Similarly, at trial, Mixon said the shooter stood a foot away with the gun against Tyler's back. The Cook County Medical Examiner, however, testified that no physical evidence indicated the gun was fired from close range. The discrepancies between Mixon's accounts and the Medical Examiner's independent findings signal that stress and the weapon focus effect distorted Mixon's perception and memory.

¶ 43   Laster's attention was directed to protecting everyone in the car. He shouted for safety, huddled down, and did not see the shooter's face. Washington's attentiveness was rattled by fear as well. That she recalled generalities reflected a lack of attentiveness.

¶ 44   Thomas testified about "practically see[ing]" the shooter and relying on what Mixon told him, classifying his degree of attention as low.

¶ 45   This factor favors the defense.

¶ 46                    *Accuracy of Prior Description of Offender*

¶ 47   Neither Mixon nor Thomas gave a prior description of the shooter. While in the hospital, Mixon identified Johnson but explicitly retracted that statement at trial. Thomas, too, disavowed having seen Johnson, emphasizing he repeated to police what Mixon had told him at the scene.

¶ 48   As for Washington and Laster, police took a joint description after the shooting: "[M]ale black, medium brown complected between the age of 16 and 25, about [five-six], [five-nine], between [125], 150 pounds with black hair in a faded type of haircut." These characteristics are both general and vague (for example, the nine-year spread in age) and would apply to tens of thousands of local young men.

¶ 49   At trial, the couple offered minimal to no descriptions. Laster said the shooter wore white pants, a black bomber jacket, and a black cap. Washington gave conflicting descriptions of the shooter's skin color. At the photo array, Washington justified her choice with new revelations: the shooter had caramel skin (statement to police was "medium brown complected" and a big nose and big lips (not in statement to police), which is probative of misidentification. Similarly, at trial, she could only say the shooter wore white jeans and a baseball cap.

¶ 50   Our supreme court has found that "a witness' positive identification can be sufficient even though the witness gives only a general description based on the *total impression* the accused's

appearance made." (Emphasis added.) *People v. Slim*, 127 Ill. 2d 302, 309 (1989); see *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 28 ("general or imprecise description *** does not necessarily render the witness's identification unreliable"). Glaringly absent from the trial record is any evidence substantiating the validity or accuracy of the original descriptions. Critically, the accuracy of a prior description favors defendant unless the State's witness gives a description at trial, which did not occur here. *In re O.F.*, 2020 IL App (1st) 190662, ¶¶ 48-50.

¶ 51    This factor also weighs in Johnson's favor.

¶ 52                                *Level of Certainty*

¶ 53    The level of certainty should be applied cautiously, so as not to overshadow other critical aspects of the identification process because a witness's confidence alone does not determine accuracy. Shari R. Berkowitz et al., *Convicting With Confidence? Why We Should Not Over-Rely on Eyewitness Confidence*, 30 Memory 1, 2 (2020), available at https://escholarship.org/content/qt2h1562k3/qt2h1562k3.pdf?t=qnyefj [https://perma.cc/M6Jn-BLM6] (noting study of first 250 DNA exonerations showed "mistaken eyewitness identifications occurred in the largest subset: 190 (76%) of [the] cases"). Though the continued validity of this factor has been challenged, it remains relevant. See *Macklin*, 2019 IL App (1st) 161165 ¶ 77 (Hyman, J., dissenting) ("The reliability of a witness's [degree of] certainty about his or her identification has been roundly criticized in this court and elsewhere."); *People v. Lemcke*, 486 P.3d 1077, 1081 (Cal. 2021) (exercising supervisory power to omit certainty from pattern instruction unless requested by defendant); *State v. Derri*, 511 P.3d 1267, 1283-84, 1288 (Wash. 2022) (noting research undermines presumed value of certainty as factor and holding "relevant, widely accepted scientific evidence" must inform reliability analysis of identification procedures).

¶ 54    Ironically, the State's most certain witness was Laster, who could not identify Johnson twice. Robert Laster told officers he had a good view of the shooter and could identify him. Yet, he failed to identify anyone in the photo array and identified a person other than Johnson in the lineup. While Washington described being "pretty sure" about her initial description when presented with photos of suspects, she and Laster identified different people as the shooter despite having sat near each other.

¶ 55    Although Mixon informed the ASA that the shooter was Johnson, at trial, he testified unequivocally that he did not see the shooter and Johnson was not the shooter. For his part, while Thomas identified Johnson in a photo array, he testified at trial that he never saw the shooter, saying he repeated to police what Mixon told him.

¶ 56    Whatever value this factor has favors Johnson.

¶ 57                    *Length of Time Between Crime and Identification*

¶ 58    The final factor examines the time between the offense and the identification. Mixon identified Johnson in a photo array while hospitalized shortly after the shooting. Thomas identified him the next day. Washington identified Johnson in a photo array nine days after the shooting, which, while not ideal from a recollection standpoint, falls within an acceptable range under Illinois law. See *Macklin*, 2019 IL App (1st) 161165, ¶ 88 (Hyman, J., dissenting) ("Despite Illinois cases suggesting otherwise, the reality is that an interval of 10 days before a lineup can alter and impair a person's memory."). Finally, Laster failed to identify Johnson as the shooter.

¶ 59    This factor leans in favor of the State, though it is of little value here due to the many deviations between what was said in the shooting's aftermath and the eyewitness's trial testimony.

¶ 60                    *Summary of Biggers factors*

¶ 61    The four eyewitnesses' statements before and during the trial attest that the rapid shooting's compressed timeframe left little room for them to observe or process. And this, in turn, left little for the jury to sift, weigh, and assess before drawing inferences.

¶ 62    Under *Biggers*, we decide the likelihood of misidentification, as assessed by the totality of the circumstances surrounding the identifications, drawing rational inferences in the State's favor. See *Biggers*, 409 U.S. at 199-200 (*Biggers* factors "to be considered in evaluating the likelihood of misidentification"). All but one factor favors Johnson. Under the totality of the circumstances, the State's meager evidence on the *Biggers* factors was legally insufficient to sustain the conviction.

¶ 63    To begin, the State's characterization of Robert Laster as credible ignores that he failed to identify Johnson twice: at the photo array and in the lineup. No reasonable trier of fact could rely on Laster to prove Johnson guilty beyond a reasonable doubt. See *In re Christian W.*, 2017 IL App (1st) 162897, ¶¶ 78-80 (reversing where witness testimony, "concerns [were] too many and run too deep for us to have any confidence"). The State's startling disregard for the likelihood of misidentification by Laster detracts from its position on the remaining eyewitnesses.

¶ 64    Despite the State's efforts to bolster Thomas's credibility, Mixon telling Thomas that Johnson shot him is probative. In addition, his poor eyesight seriously undermines his pretrial statement. See *People v. Kilgore*, 59 Ill. 2d 173, 175 (1974) (reversing conviction where, among others, witness "being nearsighted and without glasses, could not identify the man, nor could she state whether the man was black or white"). Thomas maintained he "practically" saw the shooter, could not determine the shooter's gender, and offered no identifying specifics other than the

shooter was a light-skinned African American. Because of these facts alone, Thomas's identification cannot stand.

¶ 65 This leaves Mixon and Washington. While "[i]t is well established that a single witness's identification is sufficient to sustain a conviction," misidentification hinges on considering all *Biggers* factors. Viewing the evidence in the light most favorable to the prosecution, a rational juror might have given more weight to Mixon's statement to the ASA than his trial testimony, due to Mixon's familiarity with Johnson and familial ties. But inferring that Mixon recognized Johnson remains improbable, even more so considering the weapon focus effect (recall that Mixon said he "blinked out").

¶ 66 Mixon's terse statement to the ASA lacked any basis to evaluate reliability:

"MIXON: [Thomas] came out the house, we on the corner, we ain't cross yet. [Thomas] come out the house. [Thomas] yelled. I looked back. Shots were fired.

STATE: Okay, so you looked back. And when you looked back, what did you see?

MIXON: I seen Antrell Johnson."

¶ 67 Rather than confronting the absence of details, the State endeavors to discredit Mixon's trial testimony and quibbles with Johnson's reliance on *Lerma*. But its response does not articulate a reason under *Biggers* to reject his unequivocal recantation at trial.

¶ 68 So, too, with Washington. She identified Johnson after scooting down in her seat and seeing, for seconds, a person wearing a baseball cap and his face partially obstructed. Along with Laster, she offered a vague description at the scene. Later, at the photo array, after staring at the photo she had selected, which was of Johnson, she mentioned for the first time the size of his lips and nose as "big," details that could be ascribed to hundreds of thousands of young black men. Further, she said Johnson's skin was "caramel" (at photo array and trial) and "medium brown

- 16 -

complected" (at scene), which contradicts Thomas's "light skin" characterization. See, *e.g.*, Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 Psychol. Pub. Pol'y & L. 3, 16 (2001) (meta-study concluding, for example, blacks better recognize black faces). But see *infra* ¶ 140 (describing Washington's different descriptions as "perfectly consistent"). Her identification lacks any distinct or unique identifiers, which limits the value of her identification. Furthermore, unlike her husband, Washington did not participate in a lineup, a crucial investigative step that would have given credence to her selection of Johnson at the photo array. Its omission is both conspicuous and telling.

¶ 69    Considering, under the *Biggers* factors, the testimony of each witness, we conclude that no rational trier of fact could find Johnson was the shooter beyond a reasonable doubt. A rational trier of fact could not rely on the out-of-court incantations of Johnson's name alone to convict him. Yet the sum of what little the State offered failed to prove not just the attempted murder of Mixon, as we know from the split verdict, but also that it was Johnson who shot Tyler.

¶ 70                                      *Regarding the Dissent*

¶ 71                                       Question Before Us

¶ 72    In legal proceedings and other contexts, the framing of an issue influences the response and outcome. So, as the *Biggers* court commands (*Biggers*, 409 U.S. at 199), we weigh the " 'totality of the circumstances' " to evaluate the likelihood of misidentification, as opposed to the dissent's opposite approach, which evaluates the likelihood of identification. See generally Katie Kronick, *Forensic Science and the Judicial Conformity Problem*, 51 Seton Hall L. Rev. 589, 611 (2021) (noting research shows judges, like all people, "are susceptible to all five cognitive biases," including hindsight bias). We must take the State's case on its own terms and draw reasonable

inferences in its favor, but we must not then speculate about how the State might now act with a second bite at the apple. *Cf. infra* ¶¶ 144, 147, 150 (pondering if State could "test" or "refute" failures in proof). For the dissent to say that we somehow have acted "*sua sponte*" in analyzing whether the State's proof was so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt is an unfortunate mindset that fundamentally misunderstands our appellate role. See *Brown*, 2013 IL 114196, ¶ 48 ("Although these determinations by the trier of fact are entitled to deference, they are not conclusive. Rather, a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. [Citations.] This same standard of review applies regardless of whether the defendant receives a bench or jury trial.").

¶ 73   The dissent concludes that "all three [eyewitnesses] positively identified Johnson as the shooter shortly after the shooting occurred." *Infra* ¶ 156. This confirms what is known from the outset: some, but not all, eyewitnesses identified Johnson, it does not end the inquiry, as the dissent believes, but rather marks the beginning. See *Stovall v. Denno*, 388 U.S. 293, 302 n.6 (1967) (citing legal literature to note "widely condemned" nature of showups); *Manson v. Brathwaite*, 432 U.S. 98, 111 (1977) (considering, among other things, scholars' views while adopting constitutional rule on identification evidence); *Lerma*, 2016 IL 118496, ¶ 24 (citing state supreme courts as collecting scientific studies relevant to identification evidence).

¶ 74   The dissent cites case law to support discrete facets of the testimony as if this suffices under *Biggers*. After over 50 years of case law, one can find support for nearly any proposition. That goes for the majority, too. Like fingerprints, however, no two cases involving eyewitnesses to a shooting share precisely the same facts affecting perception. Our legal analysis draws primarily on *Biggers*, the evidence in this case, and the myriad interconnected "estimator variables," the formal

term academics use to refer to factors outside the criminal justice system that affect eyewitness perception.

¶ 75    *Biggers* acknowledged that five factors were incomplete by inserting the word "include" before enumerating them. *Biggers*, 409 U.S. at 199 ("the factors to be considered in evaluating the likelihood of misidentification *include*" (emphasis added)). Since *Biggers*, additional estimator variables have been recognized, including, among others: (i) anxiety and stress, (ii) age, (iii) physical and mental health condition, (iv) past experiences and background, (v) race, (vi) collaboration, (vii) memory issues, and (viii) intoxication or drug use, along with (ix) nature of event as violent or traumatic, (x) weapon focus, (xi) environmental conditions, distance, and visibility, (xii) lack of distinctive characteristics, (xiii) police procedures, (xiv) disguises or obstructive clothing, and (xv) sequence of the event.

¶ 76    We have discussed the interplay of many of these estimator variables because, in isolation, they tell a different story than when viewed, as they must be, collectively. See, *e.g.*, *supra* ¶¶ 31-36 (variables (i), (vii), (ix), (x), (xi), (xiv), (xv)), ¶ 40 (variables (iii), (viii)), ¶ 48 (variable (vi)), ¶ 49 (variable (v)), ¶ 54 (variables (xii), (xiii)); see generally Henry F. Fradella, *A Synthesis of the Science and Law Relating to Eyewitness Misidentifications and Recommendations for How Police and Courts Can Reduce Wrongful Convictions Based on Them*, 47 Seattle U. L. Rev. 1, 22 (2023) (noting *Biggers* factors "depend on complex psychological issues pertaining to perception and memory—some of which are quite counterintuitive").

¶ 77    The dissent does not outright reject a full analysis of these factors, preferring to waffle between criticizing the majority for discussing them and describing at least some variables as "widely accepted." *Infra* ¶ 145. In leveling its critique, the dissent overlooks Johnson's briefing on *Biggers* and *Lerma* and our appellate courts' regular reference to academic works to inform a

deeper understanding of issues. *E.g.*, *In re Marriage of Cotton*, 103 Ill. 2d 346, 357-59 (1984) (holding "somewhat contradictory order" on child custody was not against manifest weight of evidence when read against record, caselaw, and academic literature); *People v. Bush*, 2023 IL 128747, ¶¶ 60-61 (rejecting as "arbitrary" a ruling on admissibility of statement given statute, caselaw, and academic literature).

¶ 78    Simply put, no "eyewitness exception" bars appellate review of Johnson's sufficiency challenge. As even the dissent's citations illustrate, appellate courts increasingly rely on social science research in eyewitness identification cases to prevent wrongful convictions. *Infra* ¶ 145. And, as we will discuss, eyewitness testimony carries immense weight in the courtroom, contributing to more wrongful convictions than any other cause. *Infra* ¶ 90. Recognizing this, courts turn to scientific studies to pinpoint the issues that undermine accuracy, such as the misplaced confidence of witnesses.

¶ 79    This is a matter of procedural fairness and is fundamental to the result due to the unreliability of human perception. To see how, consider the dissent's malleable concept of common sense. The dissent cites a 25-year-old decision, which in turn cites a 55-year-old decision, for the proposition that familiarity renders the other factors less relevant. *Infra* ¶ 120 (citing *People v. Brooks*, 187 Ill. 2d 91, 130-31 (1999) citing *People v. Robinson*, 42 Ill. 2d 371, 375-76 (1969)); see *infra* ¶ 124 (noting how Mixon knew Johnson before). But decades ago, "relevant research was in its relative infancy." *Lerma*, 2016 IL 118496, ¶ 24. Since then, "we not only have seen that eyewitness identifications are not always as reliable as they appear, but we also have learned, from a scientific standpoint, why this is often the case." *Id*. Older cases in this area of the law must be considered with heightened scrutiny.

¶ 80    To inform legal reasoning properly, common sense involves examining societal and individual norms and behaviors rooted in human nature. As the essayist William Hazlitt remarked, "Common sense, to most people, is nothing more than their own opinions." For that and other reasons, we follow decades of caselaw, articles in legal and research journals, and "widely accepted" science on eyewitness accounts. See *id.* (science of eyewitnesses "largely unfamiliar to the average person" and includes "counterintuitive" principles (internal quotation marks omitted)); see also *Derri*, 511 P.3d at 1288 (holding "relevant, widely accepted scientific evidence" informs reliability analysis of identification procedures).

¶ 81    Finally, we disagree over what inferences support the State's position. Only reasonable ones do. To be reasonable, an inference must arise from a realistic evaluation of the evidence, using rational and logical reasoning drawn from established facts, avoiding suspicion, imagination, conjecture, or subjective impressions. *People v. Davis*, 278 Ill. App. 3d 532, 540 (1996) ("If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation."). Asserting, as the dissent does (*infra* ¶ 155), that the jury picked a side when faced with conflicting evidence is error. A jury verdict standing alone is never conclusive. *Brown*, 2013 IL 114196, ¶ 48. As a reviewing court, we assess the factual basis of a witness's identification, whether made in court or out. See *Id.* And then, drawing reasonable inferences in the State's favor, we set aside a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of guilt. *Id.* The dissent slams the door on performing the review *Brown* sets out.

¶ 82                    Face-Value Acceptance of Eyewitness Accounts

¶ 83    The dissent accepts the eyewitnesses' accounts to support the jury's split verdict (i) even though the State failed to satisfy its evidentiary burden under *Biggers*, (ii) even though the

- 21 -

eyewitnesses contradicted one another and themselves, and (iii) even though the State presented no physical evidence or evidence of motive by a masked shooter.

¶ 84    The record reveals the following portrait. Face partially covered, the shooter darted to and from the scene, much to the admitted shock of Thomas, Mixon, and Washington. Consider that (i) the whole incident unfolded in seconds, (ii) with the eyewitnesses 30 or more feet away, except for Mixon, who thought the shooter was within a foot or two, (iii) their view hindered by obstructions, (iv) of a fast-moving person, (v) about whom they could not identify any distinctive features, (vi) while in emotional states of stress and anxiety, (vii) from an unexpected, sudden, and violent act, (viii) that left no time for observation, let alone comprehending what was happening. Based on the unique interplay of these variables, each eyewitness's likelihood of misidentification becomes no longer a possibility but an inevitability. Yet the dissent's analysis glides over these facts and instead clings to uncertain evidence and weak reasoning.

¶ 85    The dissent also grants itself wide latitude in recounting the evidence. Examples: Explosive, sudden violence becomes an "incident last[ing] less than a minute" (*infra* ¶¶ 119, 126) (analyzing Thomas and Mixon testimony); looking down the barrel of a loaded gun becomes an "adequate opportunity" (*infra* ¶ 126) (describing Mixon's testimony); uttering a name becomes an "immediate[ ]" identification (*infra* ¶¶ 128, 130) (describing Mixon's out-of-court statements); four eyewitnesses become "all three" (*infra* ¶¶ 114, 156) (summarizing own analysis); a height-and-weight description that is wrong becomes "slightly off" (*infra* ¶ 140) (describing Laster and Washington's initial description to officers); and a witness providing "additional details" over time becomes "perfectly consistent" (*infra* ¶ 140) (describing arrest report and Washington's statements at scene and photo array). Under such an interpretation, the *Biggers* framework crumbles.

¶ 86    What the dissent calls an "adequate opportunity" amounts to a presumption about witness certainty. See, *e.g.*, *infra* ¶¶ 128, 118 (asserting Mixon "immediately" accused Johnson and that Thomas and Washington "positively" identified Johnson in array). That Washington was frightened—looking across car seats and actively hiding from the masked shooter streaking past her unexpectedly—carries no weight for the dissent because it was " 'pretty much daylight.' " *Infra* ¶ 138 (quoting Washington). Washington's opportunity to see the shooter was no better than Laster's. Yet, the dissent disregards Laster and accepts Washington, who, after selecting Johnson from the photo array, commented on his skin color and big lips and big mouth and was never asked to attend a lineup, unlike Laster. *Infra* ¶ 143. That Mixon had been drinking "a lot" and saw only the gun carries no weight for the dissent because, out of court, at least, he had named Johnson, though he never described the shooter afterward or to the jury and unequivocally recanted. *Infra* ¶ 129. Indeed, the dissent remarkably proclaims Mixon had "no need" to provide factual details or description (*infra* ¶ 130), though *Biggers* says otherwise. *Biggers*, 409 U.S. at 199 (directing courts to consider " 'totality of the circumstances' ").

¶ 87    Surprisingly, the issue of Thomas's eyesight carries no weight for the dissent. *Infra* ¶ 121. We know the shooter ran up behind Tyler and Mixon, placing the two of them between Thomas and the shooter. It defies belief that Thomas could make an identification when the shooter's head and mouth were covered and Tyler and Mixon were in his line of sight. Recall, Thomas said he did not know whether the shooter was a man or a woman. Likewise, the dissent's account depends on the exact positions of Thomas, Tyler, Mixon, and the shooter, details not in the record. Without those details, the dissent has no basis to infer that, standing on the porch, Thomas could identify the shooter. Indeed, the paucity of details supports Thomas's insistence that Mixon told him the shooter was Johnson.

¶ 88    As concerns the case on which the dissent principally relies, *People v. Brooks*, 187 Ill. 2d 91, it is distinguishable in every relevant respect. In *Brooks*, an "adequate" identification was possible where an unmasked offender "lean[ed] forward" in the back seat of a car "slowly" moving past the eyewitness yards away. *Id.* at 130. Adequate means "sufficient for a specific need or requirement," "of a quality that is acceptable but not better than acceptable," and "lawfully and reasonably sufficient." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/adequate (last visited Oct. 31, 2024) [https://perma.cc/CA36/L7KX]. Considering the vast disparity between the circumstances here and in the *Brooks* case, none of the eyewitnesses had an "adequate" identification.

¶ 89    Next, the dissent relies heavily on Mixon's and Thomas's familiarity with Johnson. *Biggers* contains no exception for eyewitness familiarity. *Biggers*, 409 U.S. at 199-200 (factors apply to all eyewitness accounts). The jury needed to know what Thomas and Mixon purportedly saw and heard to reasonably credit the initial out-of-court identifications. *Id.* That did not happen. Without it, there is no way of knowing the reliability of their initial identifications. Thomas testified that his identification came from Mixon, not independently of Mixon, which, as already explained, aligns with the trial evidence. Similarly, in light of Mixon's recantation at trial, the credibility of Mixon's statements while hospitalized after the shooting become highly questionable, as the absence of specific details undermines the reliability of the initial identification and its accuracy. Crucially, Mixon thought he was shot at close range, which directly contradicts the testimony of the chief medical examiner that no shots were fired from close range. This discrepancy creates grave doubt as to whether Mixon even saw the shooter, who approached from behind him.

¶ 90    The literature on eyewitness misidentification highlights how vague or incomplete accounts can lead to wrongful convictions and erroneous conclusions about an offender's identity.

Scientific advances "have confirmed that 'eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined.' " *Lerma*, 2016 IL 118496, ¶ 24 (quoting *State v. Dubose*, 2005 WI 126, ¶ 30, 285 Wis. 2d 143, 699 N.W.2d 582); see *Macklin*, 2019 IL App (1st) 161165 ¶ 77 (Hyman, J., dissenting) ("The reliability of a witness's [degree of] certainty about his or her identification has been roundly criticized in this court and elsewhere."). Furthermore, the dissent runs afoul of our supreme court's prohibition on overemphasizing certain *Biggers* factors or, for that matter, any of the estimator variables, to the exclusion of others. *People v. Herron*, 215 Ill. 2d 167, 191 (2005) (prohibition on using "or" or "and" between the factors in Illinois Pattern Jury Instructions, Criminal, No. 3.15, Committee Note (approved July 28, 2017) where more than one factor is relevant (internal quotation marks omitted)).

¶ 91    We now know "[e]mpirical evidence and an array of DNA exonerations have confirmed that familiarity does not eliminate misidentification problems." James E. Coleman, Jr., et al., *Don't I Know You? The Effect of Prior Acquaintance/Familiarity on Witness Identification*, The Champion, April 2012, at 52, 54. Despite the dissent's insistence, the other *Biggers* factors do not become less relevant. *Infra* ¶¶ 145-146. "[S]ituational factors, the typicality effect, own-race bias, and the inaccuracy of eyewitness confidence" persist in plaguing eyewitness identifications of familiar people. Coleman, *supra* at 54.

¶ 92    Moreover, the dissent misinterprets the implications of relevant caselaw and social science research, suggesting they somehow mitigate the need for witnesses to offer the bases for their identifications. *Infra* ¶¶ 145-146. The dissent contends that "social science research" bolsters reliance on prior familiarity because some jurisdictions have added prior familiarity as a factor under *Biggers*. *Infra* ¶ 146. But "because information about a familiar individual's identity is

already stored in an identifier's brain, both contextual information and expectations triggered by surroundings or circumstances associated with the familiar person 'prime' the identifier's brain to more likely misidentify a stranger as the familiar person." Coleman, *supra* at 54. Thus, conflating an eyewitness's willingness to make an identification with his or her reasons or bases introduces error. *Id.* at 53. DNA has exonerated defendants in numerous cases involving eyewitnesses with prior experience with the accused. *Id.* at 56 n.32. We must not allow evidence to be insulated from meaningful appellate scrutiny.

¶ 93    Regarding confidence, the dissent cites to " 'an appropriately administered lineup' " and similar articles that have negligible relevance to this case. *Infra* ¶ 147 (quoting John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. in the Pub. Int. 10, 55 (2017) (concluding, "[a]ccording to the available data, the relationship between confidence and accuracy for an initial [identification] from an appropriately administered lineup is sufficiently impressive that it calls into question the very notion that eyewitness memory is generally unreliable")).

¶ 94    Finally, notwithstanding the dissent's implication (*infra* ¶ 148), neither *Lerma* nor *Macklin* dictate that defendants present "expert testimony" at trial before contesting their convictions on appeal. See *Lerma*, 2016 IL 118496, ¶ 24 (citing other states' supreme courts as collecting relevant scientific studies). Instead, while entitled to deference, the factfinder's findings are never conclusive when "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt." *Brown*, 2013 IL 114196, ¶ 48. Again, appellate review has long relied on authoritative articles to better understand an issue before them.

¶ 95                                  Role of Jury

¶ 96    Against this backdrop, we find troubling the dissent's belief that our analysis somehow has usurped the jury's "prerogative" (*infra* ¶ 131) and "invades the province of the jury" (*infra* ¶¶ 123, 131). The quest for justice does not end with the jury's verdict. Unfettered reverence for the jury's verdict, selective quotations notwithstanding, elevates error to the status of infallibility and invades appellate review, which exists precisely to correct errors by the trier of fact. *Brown*, 2013 IL 114196, ¶ 48 ("Although these determinations by the trier of fact are entitled to deference, they are not conclusive."). While we defer to a jury as the trier of fact, that deference does not replace our role of oversight. *People v. Coulson*, 13 Ill. 2d 290, 296, 298 (1958) (duty of reviewing court to "always" set aside verdicts resting on ostensibly conflicting evidence that proves "improbable, unconvincing and completely unsatisfactory").

¶ 97    The dissent relies on weak links in the chain of Illinois cases since *Biggers*. *Infra* ¶ 156 (summarizing acceptance of Thomas, Mixon, and Washington testimony). Again, our inquiry follows the *Biggers* mandate, which serves to protect against the unreliability of human perception and the all-too-common dangers of misidentification.

¶ 98                                  Split Verdict

¶ 99    For the dissent, the jury's split verdict has little significance. *Infra* ¶ 151. It is naïve to suggest that the jury's verdict regarding the shooting of Tyler can be entirely divorced from its verdict regarding the shooting of Mixon, especially when the same evidentiary foundation underlies both. The acquittal signals potential doubts about the reliability of the evidence and the credibility of the witnesses. Plus, the jury's request for clarification on the definition of "great bodily harm" suggests the jury was grappling with sufficiency of the State's proof. Thus, in

evaluating the sufficiency of the evidence as a whole, the split verdict reflects the jury's doubts about the State's case.

¶ 100                              Eyewitnesses Contradicted One Another and Themselves

¶ 101 The dissent downplays the contradictions riddling the eyewitnesses' accounts. For instance, Washington and Laster, who were seated near each other in the back seat of a car during the shooting, gave a joint description at the scene, but later identified different people as the shooter. They failed to offer specifics about the shooter's face. Regarding what the eyewitnesses said about the shooter's outfit: Was the shooter wearing a mask? Yes, Thomas testified. Or was it a hoodie pulled tight? Yes, again, said Thomas. Or was it a baseball cap? Yes, Washington and Laster testified. How about the color of the shooter's skin? No clue, Laster testified. Or medium brown, Laster and Washington said at the scene. Or caramel, Washington later testified. No, light skin, Thomas said on the stand.

¶ 102 Significantly, the dismissal of Laster's testimony (*infra* ¶ 143) is not only legally unsound but also fundamentally unjust. We know eyewitness testimony to be unreliable, which explains why *Biggers* imposes the necessity for careful scrutiny of each eyewitness. A fair assessment of guilt or innocence under the *Biggers* factors requires evaluating *all* the evidence, especially conflicting testimony, and *all* the eyewitnesses, not fixating on testimony that aligns with a particular narrative and giving short shrift to the rest. Brushing aside Laster's inability to identify the shooter while accepting Washington's photo identification—despite their nearly identical view of the shooting and the shooter and their joint statement to police—undermines Washington's identification as much, as if not more than, Laster's. Further compounding this doubt is the police's failure to invite Washington to participate in a lineup.

¶ 103                    No Physical Evidence or Evidence of Motive

¶ 104   We should learn from cases of wrongful convictions based on eyewitness identification to avoid repeating errors in judgment. See, *e.g.*, Matthew Hendrickson, *Prosecutors Won't Oppose Certificate of Innocence for Man Convicted on Testimony of Legally Blind Witness*, Chi. Sun Times, May 30, 2024, https://chicago.suntimes.com/crime/2024/05/30/certificate-innocence-man-convicted-legally-blind-witness [https://perma.cc/FHC3-3T84] (vacatur of murder conviction which rested on, among other things, no physical evidence and a legally blind witness).

¶ 105   Lack of physical evidence or motive places immense pressure on the eyewitnesses' testimony to prove guilt beyond a reasonable doubt. See, *e.g.*, *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (rejecting challenge to *Biggers* factor because "identification testimony was in part corroborated by the matching description of defendant's car with the car of the assailant"); *Herrett*, 137 Ill. 2d at 204-06 (circumstantial evidence, including proceeds of robbery, confirmed identity where witness had "several seconds" to observe attacker from "only two feet").

¶ 106                                   CONCLUSION

¶ 107   In making its assertions, the dissent overlooks key deficiencies in the eyewitness testimony and paints an incomplete picture of the facts. Eyewitnesses admitted they could not see the shooter's face or were uncertain in their identification. The dissent also fails to account for the recantations and shifting testimonies. All this, together with the split verdict acquitting Johnson of one shooting despite both victims being attacked simultaneously, raises serious doubts about the reliability of the identifications and the sufficiency of the evidence. No physical evidence and no forensic evidence—such as DNA, fingerprints, or ballistics—link Johnson to the shooting. Plus, the jury's request for transcripts of testimony and clarification on legal definitions during deliberations reflects their difficulty in reaching a conclusion based on the evidence. Confronted

by the proper scrutiny of *Biggers* and its progeny—including *Kilgore*, *Brown*, and *Lerma*—the State's case unravels.

¶ 108   Because the State failed to prove Johnson guilty of first degree murder beyond a reasonable doubt, we need not address his claim that trial counsel provided ineffective assistance.

¶ 109   Reversed.

¶ 110   JUSTICE ODEN JOHNSON, specially concurring:

¶ 111   While I concur with the majority opinion, I write separately to express my disagreement with the dissent's decision to include photographic evidence from the trial court depicting readily identifiable private residences within the dissent.

¶ 112   I believe that the lengthy dissent (approximately 34 pages long) is not particularly bolstered by the use of the photographs that, by the dissent's own description, clearly depict one of the witnesses' homes with distinctive characteristics. Indeed, the dissent explicitly describes the exact location and physical characteristics of the home. Additionally, the photographs also depict neighboring homes and a nearby church. While it is one thing for an evidentiary photograph to be used during trial and published to the jury, it is quite another thing for such photographs to be included in a published opinion of the reviewing court. In light of the fact that this is a murder case, my main concern is for the safety of the individuals who reside in those homes or attend the church. However, I must also pause at the privacy rights that may be implicated by persons who live in the pictured homes that were not part of this case. While there are no standards governing the use of trial court exhibits in published opinions, and indeed the United States Supreme Court has attached exhibits to its opinions (maps and photographs of inanimate objects), I believe that great care and caution should be exercised when using photographs that contain identifying characteristics such as an address or a very distinctive façade as those used here. Such photographs,

regardless of whether they bolster a particular argument, should be subject to the same type of scrutiny that their admissibility is subject to in the first place—namely, whether the prejudicial effect outweighs any probative value. I believe that these types of photos do more public harm than good, as they publicly expose the residents of those homes to potential retaliation and danger. I therefore disagree with, and vehemently oppose, the use of the photographs in the dissent.

¶ 113   PRESIDING JUSTICE TAILOR, dissenting:

¶ 114   Three eyewitnesses in close proximity to the scene identified Antrell Johnson as the individual who shot and killed Taurean Tyler and shot and injured Deangelo Mixon on April 24, 2017, in the Englewood neighborhood of Chicago. One of the eyewitnesses "grew up" with Johnson and had known him for 10 years, a second eyewitness "knew" Johnson before the shooting and told police he "recognized" Johnson, and defense counsel conceded that the third eyewitness's testimony was "unimpeached." Nevertheless, the majority characterizes the State's evidence as "meager" (*supra* ¶ 62), finding that two witnesses were too far, one witness was too close, and no witness was positioned just right to reliably identify the shooter. To justify this conclusion, the majority (a) omits or dismisses critical facts that favor the State; (b) accepts recantation testimony of two witnesses that the jury obviously rejected as incredible; (c) ignores the United States Supreme Court's holding that a jury's split verdict is irrelevant to a sufficiency of the evidence analysis under the due process clause; and (d) *sua sponte* invokes social science research in an effort to undermine the identification of all three eyewitnesses even though that research was never presented at trial and the State had no opportunity to refute it. But when the evidence is viewed in the light most favorable to the prosecution, it is more than sufficient to uphold the jury's verdict. Therefore, I respectfully dissent.

¶ 115   The majority begins by asserting that the State's case "hinges entirely on the testimony of the four eyewitnesses" (*supra* ¶ 30), but the State's case "hinged" on the testimony of the three eyewitnesses who positively identified Johnson as the shooter—Tristan Thomas, Deangelo Mixon, and Janeese Washington.

¶ 116   The first eyewitness, Tristan Thomas, testified that he knew both Johnson and the victims prior to the shooting. Thomas said he was standing on his front porch, looking right at Tyler and Mixon, when he saw someone run in his direction and shoot Tyler from behind. Thomas's home is located on the southwest corner of South Honore Street and the alley immediately south of West 69th Street, and the shooting occurred in the intersection of the alley and Honore Street. Thomas was not specifically questioned about distance, but the photographs submitted into evidence show that Thomas was in very close proximity to the victims and the shooting. The photograph shown below, the State's exhibit no. 4, was admitted during Thomas's testimony. It shows the intersection of South Honore Street and the alley south of 69th Street, as well as the front of Thomas's house, which has a grey river rock facade.



¶ 117   During his testimony, Thomas marked the photograph by identifying 69th Street, drawing a red arrow to show where he first saw Tyler and Mixon walking down Honore Street, marking a red "X" on the front porch of his home to show where he was standing during the shooting, and writing the letters "NT" and "DM" to show where Tyler and Mixon, respectively, fell to the ground after they were shot. Although the red "X" is not visible in the reproduced photo above, it is visible on the original photograph in the record, and Thomas testified that he was standing on his front porch when the shooting occurred.

¶ 118   During cross examination, Thomas testified that he "do[es]n't see distances that well" and that he "probably should have glasses," but nevertheless confirmed that he saw the person who shot Tyler. After the shooting, Thomas ran over to Tyler and Mixon to assist them, at which point Mixon told him, "Trell [Johnson] shot me." The day after the shooting, Thomas positively identified Johnson as the shooter, after viewing Johnson's photo in a six-person photo array. After picking Johnson, he told police, "I seen him shooting yesterday around 7:30 pm at two of my friends," who he identified as Tyler and Mixon. When Thomas subsequently met with the ASA and was asked if he had a "clear unobstructed view of [the shooter]," Thomas said that the shooter's "head and a little bit of his mouth [were] covered," but confirmed that he "still had a view of [the shooter's] face" and could see "most of" it. Thomas recanted at trial. He said that he "didn't see what the [shooter] looked like"; that he only saw an African American person with "light skin," a black jacket, and "a mask shooting [his] friend"; and that he told the ASA that Johnson was the shooter because "that's what [Mixon] told [him]." However, he admitted on redirect that he told the ASA and the detective that Johnson was the shooter "[b]ecause [he] recognized him because

of light skinned." He also testified that Johnson was the "same person [he] saw out on the street shoot [Tyler] and [Mixon]."

¶ 119    Under the *Biggers* test, Thomas's identification was sufficiently reliable. Although the shooting lasted less than a minute, this was long enough for Thomas to make a positive identification of Johnson. See *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006) (rejecting defendant's argument that the "brevity of the witness's observation undermines his identification, testimony"); *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 45 (finding the evidence sufficient even though one witness saw one of the shooters for only 5 to 10 seconds and another witness observed him for less than 5 seconds); *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 30 (finding that the witness had a "sufficient opportunity to observe" the defendant during the robbery, even though it only lasted for "seconds"); *People v. Parks*, 50 Ill. App. 3d 929, 933 (1977) (finding the fact that the eyewitness had only 5 or 10 seconds to observe her assailant "was a matter to be considered by the jury in weighing the testimony, but did not render her identification insufficient, as a matter of law, to support the finding of guilty"); *People v. Rodriguez*, 134 Ill. App. 3d 582, 589-90 (1985) (finding the eyewitness's identification "sufficiently reliable," even though he "saw the face of the person who carried the gun for only a couple of seconds").

¶ 120    The reliability of Thomas's identification is bolstered by the fact that he knew Johnson prior to the shooting. See *People v. Brooks*, 187 Ill. 2d 91, 101, 130-31 (1999) (finding that the witness had an "adequate opportunity to view the assailant," even though the shooting lasted only " 'a second or so' " because the witness testified that "he had known defendant *** for a number of years," reasoning that this was the "strongest factor weighing in favor of admission" of his testimony); *People v. Williams*, 2015 IL App (1st) 131103, ¶ 74 (affirming defendant's conviction in part based on an identification made by an eyewitness who knew the defendant by the nickname

"L'il Nuk" and "had met him 'on multiple occasions' over the previous two or three years"); *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 35 (after noting that one of the eyewitnesses had known the defendant for "several years," the court found "the familiarity of two eyewitnesses with [the defendant] personally, support the conclusion that the evidence was sufficient").

¶ 121 Thomas also had an unobstructed view of the shooting. He was standing on his front porch, in broad daylight, and he was focused on the shooter as he ran up to his friends Tyler and Mixon from behind, as they were walking toward his house. As shown in the photograph above, Tyler, Mixon, and the shooter were only a short distance away from Thomas. Although the majority cryptically contends that Thomas "told police he had a clear and unobstructed view but *later admitted* that his poor eyesight made it difficult for him to see the shooter's features" (emphasis added) (*supra* ¶ 34), Thomas never told the police he had poor eyesight or that he could not see the shooter's features; rather, he consistently maintained that he "had a view of [the shooter's] face" and that Johnson was the person who was shooting at Tyler and Mixon. Thomas did not "admit[ ] that his poor eyesight made it difficult for him to see the shooter's features" to anyone else, either. In fact, the only testimony about Thomas's eyesight was elicited by leading questions from defense counsel, who asked Thomas, "the fact is you don't see distances that well, do you?" and "you probably should have glasses, is that fair?" The majority then attempts to undercut Thomas's testimony by claiming "[i]t defies belief that Thomas could [see to] make an identification when the shooter's head and mouth were covered and Tyler and Mixon were in his line of sight." *Supra* ¶ 87. But to reach this conclusion, the majority discounts Thomas's statement to police that he "had a view of [the shooter's] face" and ignores Thomas's unrebutted testimony that he was standing on his front porch at the time of the shooting. As the State's exhibit no. 4 shows, Thomas's front porch was six staircase steps above ground level, giving him a view of

- 35 -

Tyler, Mixon, Johnson, and the shootings, from a perch. See *supra* ¶¶ 116-17. Moreover, the majority introduces new facts into the record when it takes the liberty to precisely position Tyler and Mixon "between Thomas and the shooter" (*supra* ¶ 87), so that Thomas could not have possibly seen the shooter. The majority contends that Thomas's view of the shooter was blocked not only at the moment of the shootings but at all times, including in the moments before the shootings as Thomas saw Johnson run towards his victims. However, nothing in the record supports the majority's conclusion that Thomas's view of Johnson was blocked because Tyler and Mixon were "in [Thomas's] line of sight." *Supra* ¶ 87.

¶ 122  In addition to this testimony, the jury heard evidence that Thomas positively identified Johnson in a photo array the day after the shooting, told the police that he "s[aw the shooter] shoot" Tyler and Mixon, and confirmed that he "had a view of [the shooter's] face." Thomas said that the shooter's "head and a little bit of his mouth [were] covered," but he could see "most of" the shooter's face, so the fact that part of Johnson's face may have been covered does not undermine the reliability of his identification either. See *Barnes*, 364 Ill. App. 3d at 890, 893-95 (finding the evidence sufficient to support an eyewitness's identification of the defendant, even though the shooter wore a hood covering his head and a bandanna covering his face from the tip of his nose down, because the witness's identification of the defendant was "positive and *** consistent in selecting [his] picture from the photo array, in choosing him from a lineup, and in naming [him] as the gunman at trial").

¶ 123  Thomas recanted at trial and said that he "didn't see what the [shooter] looked like"; that he only saw an African American person with "light skin," a black jacket, and "a mask shooting [his] friend"; and that he told the ASA that Johnson was the shooter because "that's what [Mixon] told [him]." But the jury also heard testimony from the detective who presented the photo array to

Thomas the day after the shooting, when Thomas positively identified Johnson as "the person who fired shots at the victims," and heard the statements Thomas made to the ASA after the shooting, in which Thomas confirmed he "ha[d] a view of [the shooter's] face," could see "most of [it]," and was able to positively identify Johnson, "recogniz[ing] him because he was light skinned." The jury also heard Thomas admit on redirect that Johnson was the "same person [he] saw out on the street shoot [Tyler] and [Mixon]." While Thomas's trial testimony conflicted with his earlier statements to police and the ASA, it was up to the jury, as the trier of fact, "to accept or reject as much or as little of [Thomas's] testimony as it please[d]" (*People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006)) and to determine which of his statements was more credible. *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 27 ("it is for the trier of fact to weigh the statement, weigh the disavowal and determine which is to be believed"); *People v. Jackson*, 2020 IL 124112, ¶ 67 ("[i]t is well settled that the recantation of testimony is generally regarded as unreliable," and "it is for the trier of fact to determine the credibility of the recantation testimony"). As is apparent from its verdict, the jury determined that Thomas was honest when he made his prior statements to police and the ASA and that he was dishonest at trial (*People v. Davis*, 2018 IL App (1st) 152413, ¶ 46), and we must defer to its determination. See *People v. Green*, 2017 IL App (1st) 152513, ¶¶ 103, 107 (upholding defendant's conviction even though it rested " 'almost exclusively' " on a statement from an eyewitness who later recanted at trial because "the jury had the opportunity to hear [the witness's] prior statement and observe his testimony recanting that statement, and it determined that [the witness] was telling the truth in his original written statement, as apparent from its verdict"); *Thompson*, 2020 IL App (1st) 171265, ¶ 57 (where an eyewitness recanted at trial, the court found that "a rational juror could certainly have found [the eyewitness's] trial testimony less credible than his pretrial statement," reasoning that "[t]he jury had an opportunity

to weigh his denial against the testimony of an ASA and two detectives who testified to witnessing [the eyewitness] make his statement and sign every page of it"). The majority's rejection of Thomas's pretrial statements invades the province of the jury.

¶ 124   Deangelo Mixon, a victim of the shooting and the State's second eyewitness, also identified Johnson as the shooter on the night of the shooting. He spoke with detectives at the hospital after he and Tyler were shot and told the detectives what happened. After he named Johnson as the shooter, detectives prepared a six-person photo array, which included Johnson, and showed it to him. Mixon "immediately" identified Johnson as the shooter. On the photo advisory form Mixon signed, detectives summarized his statements. Mixon said that he "grew up with [Johnson]," had known him for years, and saw Johnson point a gun and shoot Tyler. Mixon also spoke with the ASA around 12:40 pm, the day after the shooting. The ASA determined from Mixon's nurse that Mixon last took medication around "4:30 in the morning" and then asked Mixon if the pain he was in would prevent him from recounting what happened. Mixon said it would not and consented to have their conversation video recorded. Clips of the ASA's videotaped conversation with Mixon were admitted as substantive evidence and played for the jury. During this conversation, the ASA asked Mixon, "[W]hen you looked back, what did you see?" Mixon responded, "I seen Antrell Johnson." He told the ASA that Johnson then ran back north on Honore Street and got in a black car. After Mixon positively identified Johnson in a photo array, the ASA asked him, "Are you indicating that this is the person that shot you?" Mixon immediately responded, "Yes." Mixon also told the ASA that after he was shot and Thomas came to help him, he told Thomas that "Trell [Johnson] shot me."

¶ 125   Mixon recanted at trial, however, and said he "didn't know who it was holding the gun." He claimed that when he turned around, "all I seen was the gun, shots went off and I blinked out."

- 38 -

When he was confronted with the video recording of his pretrial statements confirming that Johnson was the shooter, he claimed he "d[id] not remember" or "could not recall" making those statements. He admitted that he and Johnson had been friends, that their families were friends, and that his sister and Johnson's brother were dating and have a child together. Although he denied that this was the reason he "didn't remember" what happened two years before, he admitted that he was "scared" and "traumatized" and that he was "worried about [his] safety." During closing arguments, the prosecution and the defense both commented on Mixon's demeanor on the stand. After noting the jury's ability to observe Mixon's "demeanor and watch his body language," the State said, "[Y]ou could just see him broken. He was scared. It was as if he wanted to cry. He did everything he could, not to identify the Defendant in open court, because he is scared; and that is the reality." Defense counsel made a similar comment, noting that Mixon "had a demeanor that was a bit sheepish. He had a demeanor where he seemed afraid of something."

¶ 126  The totality of the *Biggers* factors support the reliability of Mixon's identification of Johnson as the shooter as well. First, Mixon had an adequate opportunity to view the shooter. He told the ASA that he was within feet of the shooter and that when he turned around, he saw Johnson point a gun at Tyler's back. Although the whole incident lasted less than a minute, courts have found identifications reliable when witnesses have viewed the suspect for only seconds. See *supra* ¶ 119.

¶ 127  In addition, Mixon told police that he "grew up" with Johnson and knew him for 10 years before the shooting. He testified that he and Johnson had been friends, that their families were friends, and that his sister and Johnson's brother were dating and have a child together. Mixon's familiarity with Johnson is another factor the jury could consider when evaluating the reliability of his testimony. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 89 (noting that in addition

to the *Biggers* factors, "[o]ur courts also consider whether the witness was acquainted with the suspect before the crime"); *Thompson*, 2016 IL App (1st) 133648, ¶ 35 (finding "the familiarity of two eyewitnesses with [the defendant] personally, support the conclusion that the evidence was sufficient"); *Commonwealth v. Johnson*, 45 N.E.3d 83, 91 (Mass. 2016) (considering "the witness's prior familiarity with the person identified, where that person is a witness's family member, friend, or long-time acquaintance" as a "factor" in assessing whether an identification is reliable).

¶ 128   Yet another factor that supports the reliability of Mixon's identification of Johnson as the shooter is that he immediately identified him. After Mixon was shot and Thomas ran over to him, Mixon said to Thomas, "Trell [Johnson] shot me." After he was taken to the hospital, Mixon named Johnson as the shooter to police and "immediately" identified him when he was presented with a photo array, which supports the reliability of his identification as well. See *Macklin*, 2019 IL App (1st) 161165, ¶ 32 ("expressions of certainty at the time of initial identification are a relevant indicator of accuracy").

¶ 129   The majority tries to undercut Mixon's ability to observe at the time of the shooting and to discredit his positive identification of Johnson by suggesting that he was under the influence of drugs or alcohol, both at the time of the shooting and when he gave his statements to police and to the ASA hours later. First, the majority highlights Mixon's testimony that he was smoking "a lot" of marijuana back in 2017 to imply that he was under the influence of marijuana at the time of the shooting, stating "the record establishes Mixon's impairment at the scene and does not clear that cloud by the time of the hospital interview." *Supra* ¶ 36. However, Mixon was asked if he was both drinking and smoking marijuana before the shooting, and he expressly denied that he had been smoking. While he admitted he had been drinking on the day of the shooting, Mixon never

said he was intoxicated or impaired by alcohol in any way, and nothing in the record suggests otherwise. Thus, the majority's conclusion that Mixon was impaired by either drugs or alcohol on the date of the shooting based solely on Mixon's admission that that he was drinking and smoking marijuana "a lot" in 2017 is simply innuendo. Second, the majority says, "[w]e do not know what medications [Mixon] had been administered for his injury before he spoke with investigators," as if to suggest he was impaired by these medications at the time he gave his statement to the ASA. *Supra* ¶ 36. While we do not know what medications Mixon may have been given, we do know that the ASA confirmed with Mixon's nurse that Mixon was last given medications more than 8 hours before he gave his videotaped statement. Moreover, Mixon's videotaped conversation with the ASA was admitted into evidence, so the jury was able to observe Mixon at the time this statement was made and to look for any signs of impairment. *Armstrong*, 2013 IL App (3d) 110388, ¶ 27 ("[t]he fact that the statement was videotaped allowed the jury to see [the witness's] demeanor and compare it to that he exhibited on the stand at trial"). I reviewed the videotaped statement as well and saw no visible signs of impairment. The majority's implication that Mixon was impaired when he gave his statement is unfounded.

¶ 130    Next, the majority suggests that the reliability of Mixon's identification is undermined by the fact that he did not provide the police with a prior description of the shooter. *Supra* ¶ 47. However, there was no need for him to do so because he "grew up" with Johnson, had known him for 10 years, immediately recognized him as the shooter, identified him by name, and then "immediately" identified him when he was presented with a photo array. This court has repeatedly held that descriptions of the offender are unnecessary when the eyewitness knows the suspect and can identify him by name. See, *e.g.*, *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 73 (stating that "concern about a witness's physical description of the offenders disappears when the witness

knows the suspect" and reasoning that because the witness knew the defendant and identified him by name, "[i]t would have been unnecessary and redundant for [the witness] to give the police a physical description" and that "[t]he absence of an initial description of the offender does not diminish the reliability of [the witness's] identification"); *Thompson*, 2016 IL App (1st) 133648, ¶ 37 (noting that "[w]hen an eyewitness is asked to select a suspect from a lineup and that suspect was previously unknown to them, then we look to whether the physical description the eyewitness gave police before the lineup squares with the actual suspect's physical features" but finding it unnecessary to rely on a prior description because the defendant was put into a lineup based on the witness's identification of defendant by name).

¶ 131   The majority places a great deal of weight on Mixon's recanted trial testimony to argue that his "account conveys a justifiable risk of misidentification." *Supra* ¶ 40. It claims that "inferring that Mixon recognized Johnson remains improbable, *** considering the weapon focus effect (recall that Mixon said he 'blinked out')" and because of Mixon's "unequivocal[ ]" testimony at trial "that he did not see the shooter and Johnson was not the shooter." *Supra* ¶¶ 55, 65. But this assumes that the jury found Mixon's trial testimony credible. The jury was also presented with Mixon's statements to the police and to the ASA, and it was up to the jury to determine whether his trial testimony or pretrial statements were more credible. *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999). The jury was able to witness Mixon's demeanor at trial as well as his demeanor during the videotaped conversation he had with the ASA the day after the shooting, where he told the ASA that Johnson was the person that "ran up" and "put the gun on [Tyler's] back" and that Johnson was the one who shot him and Tyler. By its verdict, the jury determined that Mixon was truthful when he made his statement to the ASA and that he was untruthful at trial. *Davis*, 2018 IL App (1st) 152413, ¶ 46. It was the jury's prerogative to do so,

and it could have reasonably believed that Mixon recanted at trial due to his familial ties to Johnson's family, or because it believed, based on his demeanor at trial, that he was scared to identify Johnson. "[I]t is the task of the trier of fact to determine if and when a witness testified truthfully" (*Macklin*, 2019 IL App (1st) 161165, ¶ 17), and we defer to its credibility assessments because "a court of review is not in a position to observe the witness as he testifies." *People v. Harris*, 297 Ill. App. 3d 1073, 1083 (1998); *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) ("The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the *** jury that saw and heard the witnesses."). As the trier of fact, it was within the purview of the jury to "accept or reject all or part" of Mixon's testimony. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. The majority's decision to credit Mixon's trial testimony over the statements he gave to the police and the ASA shortly after the shooting improperly invades the province of the jury.

¶ 132   The majority also hones in on the medical examiner's testimony and claims that her testimony—that none of the bullets were fired from close range—"contradicts Mixon." *Supra* ¶ 42. To find this contradiction, however, the majority again relies on Mixon's trial testimony where he described the shooter as "about a foot" away. However, the jury obviously disregarded this testimony entirely. In Mixon's pretrial statement to the ASA, he described the shooter as "about two to three feet" away. This distance is perfectly consistent with the medical examiner's findings and does not undercut the reliability of Mixon's testimony in any way.

¶ 133   The testimony of the State's third eyewitness, Janeese Washington, remained consistent throughout. At trial, defense counsel conceded as much, referring to her identification of Johnson as "unimpeached evidence." Washington testified that she was sitting in the rear passenger seat of a parked car waiting for her church choir practice to start. She was facing south on Honore

Street, very close to where the shooting occurred. She testified that it was "pretty much daylight," that she was looking through the front driver's window and the windshield of the car parked at "Honore and the alleyway" and that nothing was blocking her view. She said she saw two boys walking down the middle of the street when "another boy kind of running behind them *** pulled out a gun and *** shot the boys" in the middle of the street. The State's exhibit no. 24, a photograph which is reproduced below, was admitted during Washington's testimony.



¶ 134   Exhibit no. 24 depicts Honore Street in the foreground; the church parking lot, which is the grassy area located just south of the red church building; and the alley just south of 69th Street. Washington wrote a red X on the exhibit to show where she was parked at the time of the shooting, wrote the word "boys" to show where she first saw Mixon and Tyler walking south on Honore Street, wrote the letter "S" to show where she first saw the shooter, and wrote the letter "B" to show where Mixon and Tyler were located when they were shot.

¶ 135   Washington testified that the shooter was wearing white pants and a baseball cap. She said she saw him shoot "more than four" times, saw the boys fall to the ground, then saw the shooter "r[u]n back northbound on Honore" Street in her direction before he passed her and she lost sight of him. She said she "kind of scooted" down in her seat after the shooting because she was trying not to be seen by the shooter, but also testified that she never lost sight of the shooter when she did so.

¶ 136   After the shooting, Washington described the suspect to police as a black male, "medium brown complected between the age of 16 and 25, about five, six, five, 9, between 125, 150 pounds with black hair in a faded type of haircut." The description of Johnson taken from his arrest report indicates that he is a 21-year-old black male, 5' 10 and 170 pounds with brown eyes, black hair, a "short hair style," and a "medium brown complexion."

¶ 137   Nine days after the shooting, Washington was shown a six-person photo array and positively identified Johnson as the shooter. When police specifically asked her what she noticed about the shooter's face, she said, "I noticed that he was like kind of caramel skin, his nose was big and his lips were big, I couldn't really see his eyes because he had the cap on, but I noticed his nose and lips." She explained that she "was pretty sure that that was the person" and testified that she "wouldn't have picked someone unless [she] was certain." When she was asked at trial if she was "certain that the person [she] identified is the same person [she] saw out on the street shooting on April 24, 2017," she responded that she was.

¶ 138   All five of the *Biggers* factors support the reliability of Washington's identification. First, Washington was " 'close enough to the accused for a sufficient period of time under conditions adequate for observation.' " *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40 (quoting *People v. Carlton*, 78 Ill. App. 3d 1098, 1105 (1979)). Washington testified that it was "pretty much

- 45 -

daylight" and that nothing was blocking her view when she witnessed the shooting. Testimony from her husband, Robert Laster, who was seated in the car next to her, as well as photographs admitted into evidence, confirm that Washington was approximately 30 feet from where the shooting occurred. This court has rejected challenges to the reliability of identifications made from much greater distances. See, *e.g.*, *People v. Houston*, 185 Ill. App. 3d 828, 833-34 (1989) (finding the evidence sufficient to convict even though a witness observed the defendant from at least 70 feet away); *People v. Thomas*, 49 Ill. App. 3d 961, 968 (1977) (finding a witness had an "ample opportunity" to make an identification from approximately 50 feet); *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 52 (finding identifications made from 20 to 60 feet sufficiently reliable). Although the shooting lasted "maybe a minute," this gave Washington sufficient time to observe the shooter. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification found reliable even though "the entire incident took less than a minute"); *Macklin*, 2019 IL App (1st) 161165, ¶ 30; *Brooks*, 187 Ill. 2d at 130.

¶ 139   Second, Washington was focused on the shooter. She testified that she observed two young men walking down the street and that she continued to observe them when she saw another young man running towards them. She said that she witnessed the shooting, and then saw the shooter "r[u]n back northbound on Honore" Street past her car before she lost sight of him. When he ran north past the car she was in, even as she had "scooted" down after the shooting, she never lost sight of him until he ran past her.

¶ 140   Third, the initial description of the shooter that Washington gave to police is consistent with the physical description of Johnson in his arrest report. The majority claims that Washington "recalled [only] generalities" (*supra* ¶ 43), but this is inaccurate. Washington accurately described Johnson's age, race, hair color, hair style, and skin color, which is listed as "medium brown

complexion" on his arrest report. Only the height and weight were slightly off. See *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 22 (finding a witness's description of the defendant to be "accurate" when she described him as a "5-foot-7-inch, 200- or 210-pound, dark-skinned black male between 20 and 25 years old" even though the arrest report described a "24-year old 'male black,' '5'8'',' '156 lbs' with 'Dark Brown Complexion' "). The majority also claims that Washington's descriptions of the shooter's skin color were "conflicting" (*supra* ¶ 49), but her initial description—medium brown complexion—and the description she gave to police nine days after the shooting—"caramel" colored skin—are perfectly consistent. In addition, the majority claims that, "[a]t the photo array, Washington justified her choice with new revelations." *Supra* ¶ 49. However, these "new revelations" the majority references were merely additional details Washington provided in response to express questioning from police, who asked her what she "noticed about the shooter's face." Washington said she "couldn't really see [the shooter's] eyes because he had the cap on," but that she recognized Johnson as the shooter because she "noticed that he was like kind of caramel skin, his nose was big and his lips were big." The fact that Washington was unable to describe Johnson's eyes or the upper part of his face because of the hat he was wearing does not undermine the reliability of her identification. See *People v. Slim*, 127 Ill. 2d 302, 308-09 (1989) ("It has consistently been held that a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness'[s] positive identification can be sufficient, even though the witness gives only a general description based on the total impression the accused's appearance made."); *Tomei*, 2013 IL App (1st) 112632, ¶¶ 50-52 (finding a witness's description of "two white males wearing dark jackets and dark hats" sufficient to sustain defendant's conviction because the owner made a positive identification and testified that he recognized defendant's face); *In re N.A.*, 2018 IL App (1st)

181332, ¶¶ 27-28 (finding a witness's identification of the defendant reliable, even though she described the suspect as a "nondescript, 20-year-old who stood between 5 feet, 10 to 11 inches, in height"); *Williams*, 2015 IL App (1st) 131103, ¶ 75 ("Where the witness makes a positive identification, precise accuracy in the preliminary description is not necessary.").

¶ 141 The last two *Biggers* factors weigh in favor of reliability as well. Washington positively identified Johnson as the shooter from a six-person photo array just nine days after the shooting, and courts have found identifications sufficiently reliable when far more time has passed. See, *e.g.*, *Green*, 2017 IL App (1st) 152513, ¶¶ 113-14 (finding an eyewitness identification sufficiently reliable even though it occurred three months after the shooting); *Daniel*, 2014 IL App (1st) 121171, ¶ 22 (affirming defendant's conviction where the witness made an identification within three months of the crime). Finally, Washington identified Johnson with sufficient certainty, telling police she was "pretty sure" he was the shooter when she picked him out of a photo array; testifying that she "wouldn't have picked someone unless [she] was certain"; and then, after identifying Johnson in court, testifying that she was "certain that the person [she] identified is the same person [she] saw out on the street shooting on April 24, 2017."

¶ 142 The majority takes issue with the fact that Washington did not identify Johnson in an in-person lineup. *Supra* ¶ 68. But when Washington was initially called to the police station on May 3, 2017, to see if she could identify the shooter, Johnson was not yet in custody, so it was not even possible for her to view him in an in-person lineup. Then, after she had positively identified Johnson in a photo array, there was no need—or requirement—for her to identify him in an in-person lineup as well. See 725 ILCS 5/107A-2(c) (West 2014) (stating that "there is no preference as to whether a law enforcement agency conducts a live lineup or a photo lineup"). The majority cites no evidence or case law to indicate that repeated lineups are necessary or that live lineups are

better than photo lineups for identification purposes. Following the " 'well-settled principle' " that all " 'five [*Biggers*] factors *** should be considered in determining the reliability of identification evidence' " (*People v. Herron*, 215 Ill. 2d 167, 191 (2005) (quoting *People v. Jackson*, 348 Ill. App. 3d 719, 739 (2004))), Washington's identification was sufficiently reliable.

¶ 143 Turning to the testimony of Robert Laster, the majority places heavy emphasis on his inability to identify Johnson as the shooter to undercut the reliability of the identifications made by Washington, Mixon, and Thomas. The majority claims Laster was "the State's most certain witness" and that he had "the next-best view of the shooter" after Mixon (*supra* ¶¶ 35, 54), but neither statement is supported by the record. As the photos in the record reflect, Thomas had a better view than Laster did. He was in closer proximity to the shooter than Laster, testifying that he was standing on his front porch, looking right at Tyler and Mixon, when he saw someone run in his direction and shoot Tyler from behind. Unlike Laster, he told the police he "had a view of [the shooter's] face." The majority's characterization of Laster as the "most certain witness" is equally unfounded. Although Laster initially told police he "got a pretty good look at the guy" and "thought [he] would be able to [identify]" the shooter, he was unable to make a positive identification of Johnson, either from a photo array or in a live lineup. However, the jury heard Laster testify that on the evening of the shooting his focus was not on the shooter; rather, his "focus was just mainly just to keep everybody else calm, *** and just to make sure we weren't, you know, casualties." At no point did Laster say with any certainty that he could identify the shooter. This is in stark contrast to the testimony of Mixon—who told Thomas seconds after the shooting, "Trell [Johnson] shot me" and who "immediately" identified Johnson's photo in a photo array—as well as the testimony of Thomas—who identified Johnson the day after the shooting and told police that Johnson was "the person who fired shots at the victims"—and the testimony of Washington—

who said she was "certain" that Johnson was "the same person [she] saw out on the street shooting on April 24, 2017." In sum, the eyewitness identification evidence in this case was more than sufficient to convict Johnson.

¶ 144    The majority's analysis is flawed in other ways, chief among them its *sua sponte* reliance on social science eyewitness identification research studies to overturn Johnson's conviction. For example, relying on this research, the majority contends that familiarity does not eliminate misidentification problems and can instead contribute to wrongful convictions. *Supra* ¶ 91. As a result, the majority concludes that even though Thomas and Mixon both knew Johnson, they could not reliably identify him. But Johnson did not call an expert to testify about the science behind eyewitness identification. Thus, the studies that the majority invokes are not part of the trial record, and the jury had no occasion to consider them. Nor did Johnson cite these studies in his appeal. Instead, the majority quotes selective language from social science journals it found on its own to justify its conclusion that the eyewitness identifications were unreliable in this case. But judges are not social scientists, and, more importantly, the State never had an opportunity to refute or explain the nuances of the studies the majority now vouches for, either through cross examination or through its own expert.

¶ 145    Scientific evidence is based on principles that are not within the knowledge or experience of the average juror. *People v. Heineman*, 2023 IL 127854, ¶ 74. Such evidence is meaningless to an average juror unless it is accompanied by an explanation provided by an expert witness. *Id.* The social science research studies on eyewitness identification the majority invokes are not within the knowledge or experience of a layperson. Had Johnson offered an expert to testify about the effect of familiarity on the reliability of eyewitness identifications, the State would have had an opportunity to cross examine the expert and the research upon which he relied and

to counter with its own expert. In doing so, the State's expert could have cited its own studies, including one that concludes identifications "can be very accurate, especially where an eyewitness has had extensive and/or meaningful prior exposure to a personally familiar perpetrator." Jonathan P. Vallano et al., *Familiar Eyewitness Identifications: the Current State of Affairs*, 25 Psychol. Pub. Pol'y & L. 128, 133 (2019). The State's expert could have also introduced additional studies, which indicate that "eyewitness identification errors are made rarely when the perpetrator is someone that is already known to a witness." Andrew J. Russ et al., *Individual Differences in Eyewitness Accuracy Across Multiple Lineups of Faces*, 3 Cognitive Res.: Principles and Implications 1, 2 (2018). This principle is so widely accepted that a number of states have expanded upon the *Biggers* factors to include a witness's familiarity with the perpetrator in their jury instructions. See, *e.g.*, *Commonwealth v. Gomes*, 22 N.E.3d 897, 906, 908 (Mass. 2015) (noting that "jury instructions are intended to provide the jury with the guidance they need to capably evaluate the accuracy of an eyewitness identification" and discussing an instruction which includes "the witness's prior familiarity with the offender" as a factor for the jury to consider when evaluating an eyewitness identification); *State v. Allen*, 494 P.3d 939, 948 (Or. Ct. App. 2021) (noting that the "effect the witness's familiarity with the suspect has on the reliability of the identification \*\*\* is simply one of the many factors to consider in assessing the reliability of the eyewitness identification"); *State v. Booth-Harris*, 942 N.W.2d 562, 578 (Iowa 2020) (discussing its criminal jury instruction that the jury consider "whether the witness had known or seen the person in the past" when evaluating the identification testimony).

¶ 146   Thus, the majority's contention that "familiarity does not eliminate misidentification problems" (internal quotation marks omitted) (*supra* ¶ 91) and its suggestion that Thomas's and

Mixon's familiarity with Johnson did not support the reliability of their identifications is directly refuted by social science research that the State's expert could have presented had Johnson offered expert testimony regarding familiarity at trial. The majority also ignores cases from Illinois and other jurisdictions, holding that a witness's familiarity with the defendant supports the reliability of his or her identification. See *State v. Lerma*, 2021 IL App (1st) 181480, ¶¶ 94-95 (finding "ample reason for [a witness] to be able to recognize [defendant]" when evidence established that the defendant was "frequently on [the witness's] block," reasoning that "recognizing someone, especially someone with whom one has some familiarity rather than a stranger, 90 feet away in daylight does not strike us as improbable"); *Luellen*, 2019 IL App (1st) 172019, ¶¶ 68-69 (finding the fact that a witness "did not simply look at two people running past him" but "watched as two people that he had known for a significant period of time ran past him at close proximity" supported the reliability of his identification); *Sullivan*, 366 Ill. App. 3d at 783 (finding a witness's identification of defendant reliable when the witness testified that he "had seen defendant 'plenty of times' before the night of the shooting and could have recognized him easily"); *State v. Outing*, 3 A.3d 1, 42 n.8 (Conn. 2010) (Palmer, J., concurring, joined by Norcott and Vertefeuille, JJ.) (noting that the dangers of eyewitness misidentification "are generally limited to eyewitness identifications of strangers or persons with whom the eyewitness is not very familiar" and that "the identification of a person who is well known to the eyewitness does not give rise to the same risk of misidentification as the identification of a person who is not well known to the eyewitness"); *People v. Hicks*, No. 298126, 2011 WL 6376014, at *2 (Mich. Ct. App. 2011) (upholding defendant's conviction where the eyewitness testified that he had known defendant for 10 to 12 years and specifically recognized defendant as the shooter, gave defendant's name to the investigating officers, and then identified defendant in a photographic

lineup, reasoning that "[e]yewitness identification by someone well-acquainted with the defendant is especially reliable and more likely to be accurate").

¶ 147    The majority relies upon another social science study to bolster its contention that a witness's "level of certainty should be applied cautiously so as not to overshadow other critical aspects of the identification process because a witness's confidence alone does not determine accuracy." *Supra* ¶ 53. Had the defense presented this study through an expert at trial, however, the State would have had an opportunity to refute it with testimony from its own expert, who could have presented a study saying just the opposite. See, *e.g.*, John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. in the Pub. Int. 10, 55 (2017) (concluding that "[a]ccording to the available data, the relationship between confidence and accuracy for an initial [identification] from an appropriately administered lineup is sufficiently impressive that it calls into question the very notion that eyewitness memory is generally unreliable" and finding that "an initial [identification] made with high confidence is highly indicative of accuracy").

¶ 148    Yet another social science theorem the majority invokes to support its conclusion that Mixon's and Tyler's identifications of Johnson as the shooter were unreliable is the "weapon focus" effect, claiming that the presence of a weapon "compromised [their] attention" and "distorted Mixon's perception and memory." *Supra* ¶¶ 33, 39, 42. Again, however, the majority bases its conclusion not on the testimony of an expert presented at trial, but on a study it found through its own research that was never presented to the jury. See *People v. Tisdel*, 338 Ill. App. 3d 465, 467 (2003) (noting that expert testimony is used to "dispel[ ] myths or attack[ ] commonsense misconceptions about eyewitness identifications, such as the effects of stress and weapon focus on the accuracy of identifications" and "provide[ ] the jury with useful information

about the kinds of mental factors involved in the identification process, such as the effect of time on the reliability of identifications, the forgetting curve, and problems with cross-racial identifications"); *People v. Allen*, 376 Ill. App. 3d 511, 526 (2007) (noting that the role of an expert witness on eyewitness identification is to "supply relevant data"); *Lerma*, 2016 IL 118496, ¶¶ 24, 26 (affirming the appellate court's decision to reverse and remand for a new trial with directions to allow expert testimony on eyewitness identification, reasoning that, in appropriate cases, social science research is "a perfectly proper subject for expert testimony," especially in cases where "the State's case against defendant hangs 100% on the reliability of its eyewitness identifications"); *Macklin*, 2019 IL App (1st) 161165, ¶ 81 (Hyman, J., dissenting) ("The entire point of presenting expert testimony on the science related to eyewitness fallibility is to aid the jury in their consideration of a defendant's guilt beyond a reasonable doubt ***."). Johnson chose not to call an expert to present this social science research at trial, however, leaving the jury no opportunity to consider it. *Cf. People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 32 (finding defendant's argument that social science research suggests a weak correlation between confidence and accuracy of an identification "unpersuasive" where he presented no such evidence at trial to support a finding that the witness's certainty should be given little weight); *Tomei*, 2013 IL App (1st) 112632, ¶¶ 55-56 (reasoning that because the defendant failed to present the testimony of an expert on eyewitness identification research, it was not persuaded that "defendant's argument *** that the fourth factor, the witness's level of certainty, should be given little weight").

¶ 149   To justify its *sua sponte* reliance on social science research, the majority claims it is simply following our supreme court's lead in "regular reference to academic works to inform a deeper understanding of issues." *Supra* ¶ 77. However, the decisions the majority cites (*supra* ¶ 77) do not support its *sua sponte* reliance on social science research here. In *In re Marriage of Cotton*,

103 Ill. 2d 346, 359 (1984), the court relied upon case law as well as two law review articles to support its conclusion that the evidence was sufficient to justify the trial court's view that it was in the child's best interests to modify the custody decree. And in *People v. Bush*, 2023 IL 128747, ¶ 61, the court did not directly rely on any "academic works"; instead, it relied on a Nevada case that quoted from a law journal article to justify its finding that the trial court's decision was "arbitrary because it was based on the purported platform of the statements, a rap video, as opposed to the substance of the statements."

¶ 150   The majority then justifies its *sua sponte* introduction of the social science research as a matter of "procedural fairness." *Supra* ¶ 79. However, procedural fairness works both ways, undermining the majority's introduction of and reliance upon social science research that the State had no opportunity to test or refute.

¶ 151   The majority's next misstep is its repeated reference to the jury's split verdict to suggest that the evidence was insufficient to support the jury's verdict on the first degree murder count. *Supra* ¶¶ 2, 6, 26, 69, 83, 98, 99. However, sufficiency of the evidence review "involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt," a review which "should be independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell*, 469 U.S. 57, 67 (1984); *People v. Brown*, 2017 IL App (3d) 140514, ¶ 18. Therefore, the jury's split verdict should not factor into our analysis in any way. What is more, "[i]t is inappropriate for us to speculate into the reasons behind a jury's split verdicts." *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 110. However, because the majority encourages speculation about the reasons behind the jury's decision to split its verdict, calls its decision "inexplicabl[e]" (*supra* ¶ 2), and suggests that the jury's split verdict was due to the weakness of the State's case, I find it important to point

out that the record provides a reasonable explanation. The record reflects that the jury was stuck on one of the elements of the attempt first degree murder count, which required the State to prove that Johnson "personally discharged a firearm that proximately caused great bodily harm to another person." While the jury heard evidence that Mixon was shot once in the left buttocks, no additional evidence about the extent of his injuries was presented. During deliberations, the jury asked the court, "May we have a definition of great bodily harm?" However, the court declined to provide one, merely responding, "You have all the evidence and instructions in this case. Please, continue to deliberate." This suggests that the jury acquitted Johnson of the attempt count, not because of any doubts about the reliability of the testimony of the State's three eyewitnesses who positively identified Johnson as the shooter, but due to a lack of agreement about whether Mixon's injuries rose to the level of "great bodily harm."

¶ 152   The majority highlights the lack of physical evidence or motive here and suggests that, without additional evidence to corroborate the eyewitness identifications of Johnson, "the State's case unravels." *Supra* ¶¶ 103-07. Not so. Our role, as a court of review, is to determine whether the evidence, when viewed in the light most favorable to the prosecution, is sufficient to support the jury's verdict, not to go searching for corroboration. See *Davis*, 2018 IL App (1st) 152413, ¶ 48   (finding defendant's "argument, that no scientific or physical evidence links them to the crime and they did not confess, *** fails because 'corroboration is not required and we are not to engage in looking for corroboration' " (quoting *People v. Craig*, 334 Ill. App. 3d 426, 440 (2002))); see also *Morrow*, 303 Ill. App. 3d at 677 (" '[o]nce a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was "substantially corroborated" or "clear and convincing," but it may *not* engage in any such analysis' " (emphasis

in original) (quoting *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998))). Because of the strength of the eyewitness testimony here, physical evidence tying Johnson to the shooting or motive evidence was unnecessary. See *Corral*, 2019 IL App (1st) 171501, ¶ 91 (noting that "physical evidence and a motive for the shooting were unnecessary to corroborate an eyewitness account"); *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23 ("[b]ecause the trial court found [the witness's] identification and testimony to be credible, the lack of physical evidence had no bearing on [the defendant's] conviction"); *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 55 ("The State is not required to prove motive in order to convict the defendant of first degree murder."). Our courts have repeatedly held that eyewitness statements, even prior inconsistent ones, are sufficient to prove a defendant guilty beyond a reasonable doubt. See *Davis*, 2018 IL App (1st) 152413, ¶ 48 (finding the "fact the witnesses recanted their identifications at trial and the convictions rest primarily on the witnesses' properly admitted prior inconsistent statements without corroboration d[id] not warrant reversal"); *Morrow*, 303 Ill. App. 3d at 677 (finding an eyewitness's "previous inconsistent statements alone *** sufficient to prove [the] defendant's guilt beyond a reasonable doubt").

¶ 153 Turning to the special concurrence, it criticizes my inclusion of two trial exhibit photographs, citing privacy rights and safety concerns for the individuals who reside in the neighborhood pictured. But the location of the shooting is mentioned by the majority (*supra* ¶ 16), and a quick Internet search would produce a photograph similar to the ones at issue here. In fact, a photo of the red church building pictured above and the surrounding streets was published in a newspaper article about this very case the day after the shooting. Elvia Malagon *et al.*, *Chicago Passes 1,000 Gunshot Victims for the Year, Pace of Violence Close to 2016*, Chi. Trib., April 25, 2017, https://www.chicagotribune.com/2017/04/25/chicago-passes-1000-gunshot-victims-for-

the-year-pace-of-violence-close-to-2016/ [https://perma.cc/V6RA-TDMC]. Moreover, because this photograph was already published to a jury, in a courtroom that was open to the public, I do not see how its inclusion here implicates any additional privacy or safety concerns, particularly where no individuals are shown. This court routinely publishes opinions that include the locations of shootings and the addresses of witnesses in its decisions. See, *e.g.*, *Sullivan*, 366 Ill. App. 3d at 771; *Thompson*, 2016 IL App (1st) 133648, ¶ 10; *Anderson*, 2017 IL App (1st) 122640, ¶ 31. And the inclusion of visuals in judicial opinions is not uncommon; even the Supreme Court has a "longstanding practice" of doing so. Nancy S. Marder, *The Court and the Visual: Images and Artifacts in U.S. Supreme Court Opinions*, 88 Chi.-Kent L. Rev. 331, 331, 336 (2013) (noting that the "use of images in judicial opinions is as a tool to support an argument" and that "those in dissent made use of images slightly more often than those in the majority" "need[ing] to use whatever tools are available to try to persuade the other justices to see the case their way").

¶ 154 Although the special concurrence claims that the photographs do not "particularly bolster[ ]" my dissent (*supra* ¶ 112), they are critically important because they are the only record evidence of Thomas's and Washington's proximity to the shooter at the time of the shooting. The majority overturns Johnson's first degree murder conviction based on its conclusion that the eyewitness identifications of Johnson were unreliable. It asserts that "[t]he first *Biggers* factor— the witness's ability to view the offender at the time of the offense—is the most critical" and that "distance *** can directly affect the reliability of what the witnesses claim to have seen." *Supra* ¶ 32. It describes Thomas's location at the time of the shooting as "on his porch, an unspecified distance away," and claims that due to Thomas's "poor eyesight," he lacked an adequate opportunity to view the shooter. *Supra* ¶¶ 14, 34, 64. While Thomas did not testify about his distance from the shooting, the State's exhibit no. 4 shows Thomas's close proximity, which

supports the reliability of his identification of Johnson as the shooter. The majority also claims that Washington lacked an adequate opportunity to view the shooter, claiming that she was approximately 30 feet from the shooter. *Supra* ¶¶ 8, 35. Although Washington's husband, Robert Laster, testified that he was about 30 feet from the shooting, Washington provided no testimony about her distance from the shooter and, instead, was asked to mark her location and her proximity to the shooting on the State's exhibit no. 24. This photograph is the best and only evidence from Washington about her distance from the shooter. We can assume that the jury reached its conclusion—that Washington was close enough to make a reliable identification of Johnson as the shooter—based in part on this photo.

¶ 155   In this case, the jury was responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). As a reviewing court, it is not our role to reweigh the evidence or to substitute our judgment for that of the jury but, instead, to determine, after considering the evidence in the light most favorable to the prosecution, " 'whether the record evidence *could* reasonably support a finding of guilt beyond a reasonable doubt.' " (Emphasis added.) *Wheeler*, 226 Ill. 2d at 114 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). "A single, reliable eyewitness may be enough to sustain a conviction." *Daniel*, 2014 IL App (1st) 121171, ¶ 28.

¶ 156   After viewing the evidence in the light most favorable to the prosecution, as we must, the State's evidence was more than sufficient for a rational jury to find beyond a reasonable doubt that Johnson was the shooter. The State presented not one, but three eyewitnesses, and all three positively identified Johnson as the shooter shortly after the shooting occurred. See *Macklin*, 2019 IL App (1st) 161165, ¶ 33 (the fact that both witnesses separately identified the defendant

"enhances and corroborates the accuracy of their respective identifications"). And two of the eyewitnesses knew Johnson to boot. The majority concludes that none of the eyewitnesses had an "adequate" opportunity to view the shooter because their "view [was] hindered by obstructions" and because "each eyewitness caught a fleeting glimpse of the shooter, mainly from behind, amid an extremely stressful situation." (Internal quotation marks omitted.) *Supra* ¶¶ 33, 84, 88. However, when the evidence is viewed in the light most favorable to the prosecution, it supports a finding that all three witnesses had a clear, unobstructed view of the shooter, as well as enough time to identify Johnson as the shooter with certainty. Mixon—who was only a couple feet away from the shooter—told Thomas, "Trell [Johnson] shot me" just seconds after he was shot and "immediately" identified Johnson in the photo array. Thomas told police that he "had a view of [the shooter's] face" and that he saw Johnson shooting at his friends. Washington testified that she never lost sight of the shooter as he ran back northbound on Honore Street and that she was "certain" that Johnson was the person she "saw out on the street shooting on April 24, 2017." Their descriptions of the incident sufficiently corroborate one another. Moreover, Robert Laster testified that the shooter was wearing "white pants, black bomber jacket, and I believe a black hat[,]" and video footage showed an individual wearing white pants and a black jacket running north on Honore Street just after the shooting occurred. The testimony and video are consistent with the descriptions of the shooter's clothing and direction of flight given by Washington, Mixon, and Thomas and provide further support for the State's case. See *In re J.J.*, 2016 IL App (1st) 160379, ¶ 38 (finding a "video [that] corroborated [an eyewitness's] description of both the events and defendant's hat *** len[t] additional credibility to her testimony"). Based on this evidence, a rational trier of fact could have found, beyond a reasonable doubt, that Johnson was the shooter.

¶ 157   Although the majority contends that "the rapid shooting's compressed timeframe left little room for [the eyewitnesses] to observe or process" and that "this, in turn, left little for the jury to sift, weigh, and assess before drawing inferences" (*supra* ¶ 61), it reaches this conclusion by repeatedly discounting the evidence most favorable to the prosecution. Again, "our role is not to reweigh the evidence or to substitute our judgment for that of the jury" but, instead, to determine " 'whether the record evidence *could* reasonably support a finding of guilt beyond a reasonable doubt.' " (Emphasis added.) *Wheeler*, 226 Ill. 2d at 114 (quoting *Jackson*, 443 U.S. at 318). Because the evidence presented by the State was more than sufficient to support the jury's verdict, Johnson's challenge to the sufficiency of the evidence should be rejected.

¶ 158   Johnson's ineffective assistance of counsel argument should be rejected as well. Johnson contends that he is entitled to a new trial because his trial counsel failed to call Vernon Johnson "who would have lent crucial support to [his] alibi defense."

¶ 159   At trial, Johnson presented a single alibi witness, Kennedi Myles, who claimed she was with Johnson at the time of the shooting. Myles testified that she and Johnson were dating in April 2017 and that, on the day of the shooting, she met Johnson at his grandmother's house, which is located at West 67th Street and South Winchester Avenue in Chicago. She said that she arrived in the "afternoon," and that Johnson was there with his daughter, Johnson's cousin Siya, Johnson's cousin Vernon Johnson, Vernon's girlfriend, and others. Myles said that Johnson was on the porch with Vernon and that she was in the living room when she heard gunshots go off and saw Johnson pulling his daughter inside the house.

¶ 160   On cross-examination, Myles testified that she stayed at the house with Johnson for "a few hours," but she couldn't recall what time they left. She couldn't remember the exact time she heard the gunshots either, but estimated that it was "maybe, 30, 40 minutes" after she arrived. She

admitted that she had previously spoken with an investigator from the ASA's office, but did not remember telling him she got to 67th Street and South Winchester Avenue around 2:00 or 3:00 p.m. or telling him that she and Johnson went to her house afterwards, which was about an hour away, and arrived at her house "between 7:00 and 7:30 p.m."

¶ 161   After Johnson was convicted, he filed a motion for a new trial, arguing, in part, that trial counsel was ineffective for failing to call Vernon as an alibi witness. The court set the case for a hearing, where it heard testimony from Vernon.

¶ 162   Vernon testified that Johnson was his cousin, that they were "close," that they hung out outside of family events, and "talk[ed] daily." He said that he lived at 67th Street and South Winchester Avenue and that he saw Johnson at his house "[a]round six" on the day of the shooting. Vernon said he was home with his son and his "[b]aby mother" Briana when Johnson arrived with his daughter. Vernon said that he and Johnson "sat on the porch, talking" after Johnson arrived, and that Briana and his son were also on the porch. Vernon said that "[a]round, like, six" they "heard gunshots" and then went into his room. He said Johnson stayed at his house "like, 3, 4 hours."

¶ 163   On cross examination, Vernon was asked whether he remembered speaking with lawyers for Johnson in 2017. He was asked if he "told them that [he was] with [Johnson] on April 24, 2017." Vernon responded, "Was it '17? I don't know what year it was. I think it was April. He had his daughter with. He was sitting on the front porch." He admitted, however, that he neither contacted the police to let them know they arrested the wrong person, nor contacted the State's Attorney's office to tell them that they brought charges against the wrong person.

¶ 164   After hearing this testimony, the court denied Johnson's motion for a new trial, including his claim of ineffective assistance of counsel. On appeal, Johnson again argues that his trial counsel

was ineffective for failing to call Vernon as a second alibi witness. He claims that Vernon's testimony "would have provided crucial details supporting Johnson's first alibi witness, Kennedi Myles, thus substantially strengthening Johnson's alibi defense."

¶ 165    To establish ineffective assistance of counsel, a defendant must prove that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). "The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 166    When assessing an ineffective assistance claim, the defendant "must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). "[T]rial counsel's decision whether to present a particular witness is within the realm of strategic choices that are generally not subject to attack on the grounds of ineffectiveness of counsel." *People v. King*, 316 Ill. App. 3d 901, 913 (2000); see *People v. Fuller*, 205 Ill. 2d 308, 331 (2002) ("Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel.").

¶ 167    Johnson's ineffective assistance of counsel claim fails because the record supports a finding that defense counsel's decision not to call Vernon as an alibi witness was a tactical one. See *People v. Whittaker*, 199 Ill. App. 3d 621, 629 (1990) (finding that defense counsel's decision not to call witnesses was a matter of trial strategy, reasoning that "[t]he fact that counsel knew

what [the two witnesses'] testimony would be before he made his decision lends support to the inference that his decision to not call defendant's uncle or mother was simply a tactical one" and that "[s]uch a decision, unlike one made after an inadequate investigation [citation] is presumed to be one made as a matter of trial strategy").

¶ 168    The record reflects that Johnson's attorneys spoke with Vernon sometime in 2017 to ask him what happened and that Vernon said he told them what he "knew about Mr. Antrell Johnson's whereabouts on the evening hours that day," yet they failed to call him as a witness at trial. They may have strategically chosen not to call him because they determined the jury would not have believed his testimony due to his "close" ties to Johnson, he was unable to recall specifics, or his testimony would have conflicted with the testimony of Kennedi Myles and undercut their defense. Critically, even though Myles claimed she was with Johnson on the day of the shooting, Vernon never mentioned her name when he identified the individuals who were present at his home that day. In addition, Vernon's testimony—that the shooting occurred "[a]round, like, six"—directly contradicts the State's eyewitnesses, who confirmed that the shooting occurred around 7:30 pm, as well as the testimony of Myles, who said she and Johnson arrived at Vernon's house in "the afternoon" and that the shooting occurred "maybe 30, 40 minutes" after they got there. Based on this record, defense counsel's decision not to call Vernon was the "product of sound trial strategy and not of incompetence." *Coleman*, 183 Ill. 2d at 397.

¶ 169    Therefore, Johnson's sufficiency and ineffective assistance claims should be rejected and his jury conviction upheld. I respectfully dissent.

---

*People v. Johnson*, 2024 IL App (1st) 220494

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-08698; the Hon. Thaddeus L. Wilson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christina Solomon, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Caitlin Chenus, Assistant State's Attorneys, of counsel), for the People. |

---